**AFFIRM; and Opinion Filed August 28, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01421-CR

**STACY STINE CARY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 366th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 366-81637-2011**

# OPINION

Before Justices FitzGerald, Lang, and Fillmore
Opinion by Justice Fillmore

A jury found appellant Stacy Stine Cary (Stacy) guilty of one count of engaging in organized criminal activity, six counts of bribery, and one count of money laundering. The trial court assessed punishment of ten years' confinement and a fine of $10,000 for each count, those sentences to run concurrently. The trial court suspended imposition of the sentences, and placed Stacy on community supervision for a period of ten years. The trial court required her to serve thirty days in county jail as a condition of her community supervision.[1]

---

[1] Stacy posted an appeal bond, thereby delaying the commencement of her community supervision. *See* TEX. CODE CRIM. PROC. ANN. art. 44.04(c) (West 2006); *Lebo v. State*, 90 S.W.3d 324, 329 (Tex. Crim. App. 2002) (those placed on ten years' community supervision may seek release on bail pending appeal).

In four issues, Stacy contends the evidence is insufficient to support the bribery, engaging in organized criminal activity, and money laundering convictions, and the trial court erred by excluding evidence that Stacy's husband did not need to bribe a judge to obtain favorable rulings in his child custody case. We affirm the trial court's judgments.

## Background

*Indictment*

With regard to six transfers of money ($50,000 on January 4, 2008, $25,000 on January 30, 2008, $25,000 on February 14, 2008, $25,000 on February 26, 2008, $10,000 on March 7, 2008, and $15,000 on March 14, 2008), Stacy was charged with six counts of bribery for intentionally and knowingly offering, conferring, and agreeing to confer a benefit, other than a political contribution as defined by Title 15 of the election code, or an expenditure made and reported in accordance with Chapter 305 of the government code, to Suzanne H. Wooten as a public servant:

> to-wit: a candidate for the office of Judge of the 380th Judicial District Court and presiding Judge of the 380th Judicial District Court, as consideration for Suzanne H. Wooten's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant or as consideration for Suzanne H. Wooten's decision, vote, recommendation, or other exercise of official discretion in a judicial proceeding, to-wit: filing paperwork to run for Judge, proceeding or continuing with a campaign to unseat the incumbent elected judge of the 380th Judicial District Court, and as Judge of the 380th Judicial District Court presiding over and issuing favorable rulings in cases in which [Stacy] and David Cary are parties[.]

Stacy was charged with money laundering as follows:

> [Stacy] on or about and between January 4, 2008 and March 14, 2008, . . . did then and there, pursuant to one scheme and continuing course of conduct, knowingly finance, invest, and intend to finance and invest funds that [Stacy] believed were intended to further the commission of criminal activity, to-wit: Bribery, and the aggregate value of said proceeds was $100,000 or more but less than $200,000[.]

–2–

Stacy was also charged with engaging in organized criminal activity as follows:

[O]n or about and between September 19, 2007 and October 20, 2009, . . . with intent to establish, maintain, and participate in a combination and in the profits of a combination of three or more persons, namely, [Stacy], Suzanne H. Wooten, David Cary, and James Stephen Spencer, did commit and conspire to commit the following offenses:

**Bribery**, in that [Stacy] did then and there intentionally and knowingly offer, confer, and agree to confer a benefit, other than a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305 of the Government Code, to-wit: one or more of the following transactions:

| Date of Transfer | Date of Deposit | Amount |
| --- | --- | --- |
| January 4, 2008 | January 4, 2008 | $50,000 |
| January 30, 2008 | February 4, 2008 | $25,000 |
| February 14, 2008 | February 15, 2008 | $25,000 |
| February 26, 2008 | February 26, 2008 | $25,000 |
| March 7, 2008 | March 7, 2008 | $10,000 |
| March 14, 2008 | March 14, 2008 | $15,000 |

to Suzanne H. Wooten, a public servant, to-wit: a candidate for the office of Judge of the 380th Judicial District Court and presiding Judge of the 380th Judicial District Court, as consideration for Suzanne H. Wooten's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant or as consideration for Suzanne H. Wooten's decision, vote, recommendation, or other exercise of official discretion in a judicial proceeding, to-wit: filing paperwork to run for Judge, proceeding and continuing with a campaign to unseat the incumbent elected Judge of the 380th Judicial District Court, or as Judge of the 380th Judicial District Court presiding over and issuing favorable rulings in cases in which [Stacy] or David Cary are parties; OR

**Money Laundering**, in that [Stacy] did then and there, pursuant to one scheme and continuing course of conduct, knowingly finance, invest, intend to finance and invest funds that [Stacy] believed were intended to further the commission of criminal activity, to-wit: Bribery, and the aggregate value of said proceeds was $100,000 or more but less than $200,000; OR

**Tampering with a Government Record**, in that Suzanne H. Wooten did then and there, with intent to defraud and harm another, namely, the State of Texas, the Texas Ethics Commission, or the citizens of the State of Texas, intentionally and knowingly make, present, and use a governmental record with knowledge of its falsity, to-wit: prepared, swore, or affirmed a Personal Financial Statement that was submitted to the Texas Ethics Commission and did not list and report all gifts and loans, as required by Texas Government Code Sec. 572.023, omitting [Stacy], David Cary, and James Stephen Spencer under the heading "Gifts," and the heading "Personal Note and Lease Agreements," when in truth and fact said Suzanne H. Wooten had received gifts and loans from [Stacy], David Cary, and James Stephen Spencer during the calendar year 2008;

and in furtherance of the conspiracy to commit said offenses [Stacy] performed one or more overt acts, to-wit: initiated, authorized, and executed six monetary transactions composed of wire transfers and checks totaling $150,000 to James Stephen Spencer[.]

*Evidence at Trial*

The reporter's record in this appeal includes the testimony of the numerous witnesses at trial, as well as voluminous documents admitted in evidence. Because this appeal involves a challenge to the sufficiency of the evidence to support Stacy's convictions, a rather lengthy discussion of the testimony and key exhibits admitted at trial is necessary.

Rick Robertson

David Cary (David) filed for divorce from Jennifer Cary (Jennifer) in December 2003. The divorce petition was filed in the 380th Judicial District Court of Collin County, Texas. Judge Charles Sandoval (Sandoval) was the presiding judge of that court. Rick Robertson, a board certified family law attorney practicing in Collin County, represented Jennifer throughout the divorce proceeding. Robertson testified at trial regarding the divorce and a subsequent suit affecting the parent-child relationship (SAPCR). David was represented by four different lawyers during the divorce proceeding, and in the divorce proceeding and subsequent SAPCR many depositions were taken and hearings conducted.

In the divorce proceeding, David and Jennifer reached an agreement regarding the terms of possession of their twin daughters, the amount of child support, and a fund to be established by David for the children's education expenses. Sandoval signed the final divorce decree on October 5, 2004.[2] In April 2005, Jennifer filed a SAPCR in the 380th Judicial District Court.

---

[2] The divorce decree signed by Sandoval named the parties joint managing conservators with David paying child support of $500 per month. David and Jennifer were awarded nearly equal possession of the children. The decree required the parents to reside in Dallas or Collin County. The decree also ordered each parent to pay one-half of the children's school tuition for the 2004 school year and that $75,000 from an investment account owned by David be used to establish a fund for the children's educational expenses. *In re C.H.C.*, 396 S.W.3d 33, 39 (Tex. App.—Dallas 2013, no pet.).

The parties mediated Jennifer's SAPCR, and a partial mediated settlement agreement was signed in June 2005 and filed in Sandoval's court in July 2005.

In the summer or fall of 2005, a hearing in the SAPCR proceeding was conducted on Jennifer's motion for temporary orders. David filed a motion to transfer the proceeding to Dallas County, Texas, which Jennifer opposed. Sandoval denied David's motion to transfer the case.[3] In April 2006, David filed a motion to recuse Sandoval. On May 8, 2006, the judge appointed to hear the motion to recuse denied that motion. In October 2006, a trial was conducted before Sandoval concerning a number of issues in the SAPCR. Among Sandoval's rulings following the trial was an order that David pay Jennifer's attorney's fees in the amount of $416,543.16.[4] A final order of modification was signed by Sandoval on December 1, 2006. Robertson testified that David appealed almost every order signed by Sandoval, and Robertson found it unusual that neither David nor Jennifer appealed Sandoval's final order of modification. In January 2007, David filed a motion to modify the prior order in the SAPCR. Robertson testified that in moving to modify a SAPCR order, one typically must allege some change in circumstances occurring since the last order. Robertson was surprised by David's motion to modify, because it was filed the month after Sandoval's December 2006 final order of modification. In his motion to modify, David asserted he had secured full-time employment at a higher salary than attributed to him at the entry of prior modification orders, he had married Stacy on December 3, 2006 resulting in a

---

[3] This Court issued a memorandum opinion on July 19, 2005 relating to a petition for writ of mandamus filed by David, in which he complained that Sandoval erred in denying his motion to dismiss Jennifer's petition to modify the parent-child relationship and, alternatively, denying his motion to transfer venue of the SAPCR to Dallas County, Texas. We concluded that David had not shown Sandoval clearly abused his discretion in denying his motions, and we denied David's petition for writ of mandamus. *In re David Cary*, No. 05-05-00979-CV, 2005 WL 1670797, at *1 (Tex. App.—Dallas July 19, 2005, orig. proceeding) (mem. op.).

[4] Other Sandoval rulings included appointing Jennifer as the sole managing conservator of the children, modifying the schedule for the parents' possession of the children by denying David possession of the children on weekdays, increasing the amount of child support David was to pay and ordering payment of retroactive child support, modifying the terms for reimbursement of the children's medical expenses, and ordering David to place $30,000 each year into an account for private education and medical expenses of the children. *See In re C.H.C.*, 396 S.W.3d at 39.

decrease in his monthly expenses, and he had a court-ordered duty to support a teenage daughter from a marriage prior to his marriage to Jennifer. David also moved again for transfer of the proceeding to Dallas County.[5] Jennifer answered the January 2007 motion to modify and sought an order that David pay her attorney's fees and sanctions for filing frivolous pleadings. Sandoval denied David's motion to modify the December 1, 2006 order. On June 25, 2007, Sandoval signed an order sanctioning David in the amount of $50,000.

Sandoval was opposed by Suzanne Wooten (Wooten) in the 2008 Republican primary for judge of the 380th Judicial District Court. There was no candidate in the 2008 Democrat primary for judge of the 380th Judicial District Court, so the winner of the Republican primary would be elected judge of that court in the 2008 general election. Sandoval was defeated by Wooten in the 2008 Republican primary, and his last day in office was December 31, 2008. Wooten became the judge of the 380th Judicial District Court in January 2009.

Robertson testified that in January 2009, David filed another motion to modify in the SAPCR. Robertson understood Jennifer retained attorney Kyle Basinger to represent her in David's motion to modify. Before Wooten announced her candidacy for judge of the 380th Judicial District Court, she was affiliated with Basinger's law firm and practiced in the Collin County office of that firm.

<u>Israel Suster</u>

Jennifer retained attorney Israel Suster to assist her in the collection of $416,543.16 in attorney fees and the $50,000 sanction Sandoval had previously ordered David to pay. Suster testified that to facilitate collection of these sums, he filed a Motion for Turnover Order in

---

[5] This Court issued a memorandum opinion on March 13, 2007 relating to a petition for writ of mandamus filed by David, in which he complained that Sandoval abused his discretion in denying David's motion to transfer the SAPCR to Dallas County. We concluded that David had not shown Sandoval abused his discretion, and we denied David's petition for writ of mandamus. *In re David F. Cary*, No. 05-07-00265-CV, 2007 WL 740895, at *1 (Tex. App.—Dallas March 13, 2007, orig. proceeding [mand. denied]) (mem. op.).

Sandoval's court. In the application, Jennifer sought to require the turnover to a previously appointed receiver of funds held by David's legal counsel that allegedly constituted an unused retainer paid by David, and funds held by Tolleson Private Bank that allegedly were owned by or for the benefit of David and which he had the authority to withdraw. In support of Jennifer's Motion for Turnover Order, Suster filed his affidavit and supporting exhibits which, among other things, stated that documents produced by David's legal counsel in response to a subpoena duces tecum indicate the counsel was in possession of $12,798.50 being held on behalf of David for the purpose of payment of future legal services, and that upon Suster's information and belief, David was the owner and/or beneficiary of funds held at Tolleson Private Bank. Attached as Exhibit 2 to Suster's affidavit is a copy of a $30,000 cashier's check issued by Tolleson Private Bank, representing payment by David to Jennifer of educational funds for their children that had been ordered by Sandoval. Suster therefore assumed the educational fund payment originated from an account held by or on behalf of David at Tolleson Private Bank.

Suster filed a motion to hold David in contempt for failure to pay the $50,000 sanction and for failure to provide information and documents as ordered by Sandoval on January 31, 2007. Shortly after Sandoval signed the requested turnover order, Stacy filed a petition in intervention and motion to dissolve the turnover order, and objections to subpoenas seeking information from third parties pursuant to the turnover order. Stacy sought sanctions against Suster. David filed a motion to set aside the turnover order and the orders imposing sanctions and awarding attorney's fees. At the January 3, 2008 hearing of David's motions, Stacy testified she intervened in the lawsuit because Suster and Jennifer were trying to seize Stacy's funds, claiming the funds were owned by David. At the hearing, Stacy testified she purchased the cashier's check from Tolleson Private Bank used by David to establish the educational fund

ordered by Sandoval in order to keep David from being held in contempt for failure to make the payment. Stacy also testified at the hearing regarding payments she made to attorneys who represented David. Sandoval quashed the prior turnover order and denied Stacy's motion for sanctions against Suster.

On January 3, 2008, Suster was served with a December 2007 lawsuit filed by Stacy against him in County Court at Law No. 4, Collin County, Texas. Stacy alleged Suster had committed fraud by filing a lien in the 380th Judicial District Court in conjunction with the application for a turnover order. On May 28, 2008, Judge Wheless signed an order transferring Stacy's lawsuit against Suster from County Court at Law No. 4 to the 380th Judicial District Court to be consolidated with the SAPCR involving David and Jennifer over which Sandoval was presiding. Stacy objected to Wheless transferring her lawsuit against Suster to the 380th Judicial District Court and filed a motion to reconsider the transfer. After Stacy's lawsuit against Suster was transferred to the 380th Judicial District Court, Stacy did not press for the discovery she had sought while the case was pending in the County Court at Law. However, after Wooten became judge of the 380th Judicial District Court in January 2009, Stacy pursued her motions for additional discovery and depositions. When Wooten allowed only a limited amount of the discovery Stacy requested, Stacy dismissed her lawsuit against Suster.

<u>Michael Puhl</u>

Michael Puhl is a board certified family law attorney practicing in Collin County, Texas. In 2006, the judge of the 366th Judicial District Court in Collin County was not seeking reelection, and Puhl ran as a candidate for election to that bench. Puhl's campaign expenses totaled $20,000 to $25,000, and $5,000 to $8,000 of that amount was funded from Puhl's

personal resources. Puhl testified that his opponent spent over $100,000 on the campaign. Puhl was not successful in that election.

In the fall of 2007, Puhl received a telephone call from James Spencer. Puhl had not previously met Spencer. Spencer told Puhl that he was interested in speaking to Puhl about the possibility of Puhl running for election against Sandoval as the sitting judge of the 380th Judicial District Court. Puhl's best recollection was that he met with Spencer in mid or late summer of 2007. Spencer's phone records show a phone call with Puhl on December 5, 2007, but Puhl testified his initial phone conversation with Spencer took place much earlier than that date. Either in the phone conversation or in the subsequent meeting, Spencer told Puhl that he was involved with the Texas Home School Coalition (THSC), and there were several people he knew who were dissatisfied with decisions rendered by Sandoval and were seeking an opponent for Sandoval in the 2008 Republican primary. Spencer indicated to Puhl that he could provide financial support for Puhl's campaign as well as volunteer support for walking neighborhoods to distribute campaign materials. With regard to financial support, Spencer's representations to Puhl were very general in nature; Puhl's impression was that Spencer could marshal supporters who would provide financial assistance to the campaign. Puhl also testified that most attorneys are not inclined to contribute to a campaign against an incumbent judge, because contributions are listed on the candidate's State campaign finance disclosure forms. Puhl testified that the maximum campaign contribution that could be made to a candidate for a Collin County bench in 2006 was $2,500 per household. Puhl declined to run as a candidate in the election.

### Daniel Dodd

Daniel Dodd, chair of the Democratic Party in Collin County in 2007, testified that in early November 2007, he learned Wooten wanted to run for election as a Collin County judge.

At a meeting with Dodd, Wooten indicated she was considering running for judge of the 380th Judicial District Court against Sandoval, but Wooten had not decided whether to run as a Democrat or a Republican. Dodd informed Wooten that if she ran as a Democrat, he could not give her money for signs because of a lack of funds. Dodd advised Wooten that if she had signs, the Democratic Party would make sure they were distributed.

After Dodd met with Wooten, he received a telephone call from an individual in Austin, Texas. Dodd could not remember the name of the caller, but the man told Dodd that "a bunch of lawyers . . . did not like" Sandoval and they would "like to get him out." The man told Dodd that Wooten looked like a good candidate to defeat Sandoval, and "they" wanted to help her. The man told Dodd that he thought it would probably cost about $100,000 to run a successful campaign, and he could get the money. The man was requesting permission to contact Wooten. Dodd told the man that Wooten was considering whether she would run as a Democrat or a Republican. Dodd testified that an individual had better odds of being elected in Collin County running as a Republican. Dodd gave the man Wooten's contact information. Sometime after that, Dodd contacted Wooten and inquired whether she was going to run for election as a Democrat or a Republican. Wooten informed Dodd she was going to run for election as a Republican.

### James Stephen Spencer

Spencer testified that he was charged with the same offenses as Stacy: engaging in organized criminal activity, bribery, and money laundering. He confirmed that he was being compelled to testify under a grant of testimonial immunity.

Spencer had an employment background in health care administration, but for the past fifteen years has done independent consulting work in areas ranging from marketing to finance,

with some work involving political, regulatory, and legislative matters. Spencer had some limited experience in the area of oil and gas, principally involving oil field services and removal of salt water from oil wells. He has no engineering background or college degrees. He lives in Dripping Springs, Texas, which is a four and one-half hour drive from Collin County, Texas.

Beginning in 1997 or 1998, Spencer became engaged in a contentious legal fight with his wife's parents over rights of visitation with his child and stepchild. Spencer "went to the legislature" beginning in 2005 to try to amend laws regarding parental rights that he believes are unconstitutional. Spencer is not a registered lobbyist in Texas; his legislative advocacy was in advancement of his personal interests. According to Spencer, he had a conversation in 2007 with Tim Lambert of the THSC, and Lambert thought "we're going to have to unseat some judges to get their attention around the state, especially on this issue of parental rights." Spencer indicated the THSC has between 50,000 and 70,000 dues-paying members and he thought he could possibly raise money from THSC members if he ran a candidate against a "bad judge." The THSC was the only organization that "got involved" in Wooten's campaign for election to the 380th Judicial District Court.

In 2007, Spencer met Hank Clements, a registered lobbyist, who also had political campaign experience. Clements was very knowledgeable about political advertising, including purchasing radio broadcasting time and preparation of mail, flier, and sign advertising. Spencer talked to Clements about working together on political campaigns, however Spencer knew Clements would not work as a political campaign consultant without compensation. Spencer thought working with Clements would be an opportunity to learn from Clements, develop relationships with Clements's connections, and "make some money," although Spencer testified he did not make a lot of money working on the Wooten campaign. Clements's original quote to

–11–

Spencer for working on a district court judicial campaign was $50,000. Spencer told Clements that there were only sixty-three days until the primary election and there was "no way" compensation of that magnitude "was going to happen." Wooten eventually spoke to Clements in the latter half of December 2007. Ultimately, Clements worked on the Wooten campaign and was paid $25,000 for his services.

Royce Poinsett, general counsel for the Speaker of the Texas House of Representatives, put Spencer in touch with David and Stacy in September 2007.[6] On September 19, 2007, Spencer emailed David and Stacy. The first time Spencer met David and Stacy was at their home in Dallas, Texas on October 2, 2007. That meeting lasted approximately two to two and one-half hours. Spencer learned that Stacy had an interest in a family-owned oil and gas company and also had some independent investments in the oil and gas industry. There was to be some liquidation of an investment Stacy or her family had, and she was going to have "significant proceeds from that sale" that she would either have to reinvest or incur some "pretty hefty capital gains taxes." In short, Stacy "had a significant gain that she had to turn around and put to work." David was an executive in the software industry, and Spencer told David he had clients involved in internet technology, including cyber security. Spencer felt that he and David "had some common ground on that area of business."

During the meeting, David and Stacy shared with Spencer their experience in meeting with legislators and advocating for change in laws relating to parental rights. Spencer testified that the "greatest substance" of their conversation was about the issue of parental rights, and Spencer wanted to do research on David and Stacy's legislative agenda, which involved shared-

---

[6] Poinsett testified that in 2007, he met with Spencer, who was interested in issues related to family law and, specifically, issues related to grandparents' access to children. Also in 2007, Poinsett met with David and Stacy, and they spoke with him about "presumed equal joint parenting issues."

custody concepts. At the meeting, David and Stacy told Spencer they had been through a significant, lengthy, and expensive family law battle that was continuing. Spencer also testified that during the meeting, he discussed "in general terms" with Stacy his interest in providing her consulting services in the following areas:

1.  Assessment of possible investment in new pumping technology;

2.  Analysis of the U.S. electric marketplace, and potential investment in SmartGrid-related ventures;

3.  Assistance in assessing and securing counsel in anticipation of and for contemplated litigation; and

4.  Assessment and proposal for family-centered advocacy, with an emphasis on parental rights.

According to Spencer, this discussion culminated in an Acknowledgment of Engagement letter dated October 1, 2007 (the consulting agreement) between Spencer and Stacy, which was admitted in evidence. Stacy agreed to pay Spencer $250,000 based on the "overall project," and $150 per hour pursuant to a fee schedule. The term of the agreement was October 1, 2007 to December 31, 2009. Spencer testified the consulting agreement was drafted sometime in the first half of October 2007 and back-dated to October 1, 2007. He testified he hand-delivered the consulting agreement to Stacy in October or early November 2007.

As a result of their meeting, in October or November 2007, Spencer reviewed David's divorce and SAPCR case file in the 380th Judicial District Court. It was Spencer's "determination" after reviewing the case file that Sandoval was not applying the law correctly, and it was Spencer's impression that the SAPCR was being "handled poorly." One of Sandoval's rulings that Spencer found "problematic" was a ruling in which Sandoval sanctioned David's attorney $50,000 to be paid to David's ex-wife, Jennifer.

Spencer testified that in the first half of November 2007, he decided he wanted to find a candidate to unseat Sandoval as judge of the 380th Judicial District Court, and he acknowledged that David's divorce and SAPCR were factors in that decision. There were other factors as well: an informal internet poll regarding Sandoval's performance, comments of THSC members in Collin County, Sandoval's clearance rate for cases on his docket, and Sandoval's "appellate record." It appeared to Spencer that Sandoval was a "good target" for a challenger. Spencer believed Collin County was a "high profile place to make a stand on the issue of parental rights," and a competitive judicial race in Collin County seemed a good way to make a statement that would "resonate throughout the judiciary." Spencer learned that in the history of Collin County, there had never been a challenger to a sitting district judge, so Spencer believed he and THSC could send a powerful message by unseating a judge they perceived to be unfriendly concerning parental rights issues.

With regard to identifying potential candidates to run against Sandoval, Spencer believed he telephoned several people for recommendations, including Stacy. Spencer testified that he contacted attorney Puhl regarding running against Sandoval. Spencer told Puhl he could provide operational support, grassroots support, and organizational support, and Spencer may have generally mentioned the THSC. Spencer told Puhl that he would help him raise money for the race if he committed to run. Spencer told Puhl he thought it would require between $100,000 and $150,000 to run a "serious challenge." Spencer acknowledged that very few lawyers would want to contribute to a campaign in opposition to Sandoval. Spencer knew that anyone running against Sandoval would not raise much money from attorneys before election day and that most contributions to judicial campaigns are made by lawyers. Spencer thought "other people," like grassroots activists, might contribute money to a campaign against Sandoval, although Spencer

did not know any "grassroots activists" in Collin County that he could rely on for campaign contributions. Puhl declined to run against Sandoval, and he did not think Sandoval could be defeated.

Spencer called Puhl's former law partner, Brian Loughmiller, about running against Sandoval. Spencer told Loughmiller that he would help Loughmiller raise money for the campaign, and Spencer thought he talked to Loughmiller about the amount of money required to win the race. Loughmiller declined to run against Sandoval, and he did not think Sandoval was going to be defeated in the next election cycle.

Spencer testified that Wooten's name, as a potential candidate to run against Sandoval, came from a "couple of directions." Loughmiller may have mentioned Wooten. In mid-November or mid-December 2007, Spencer contacted Dodd. Spencer told Dodd he was looking for a candidate to run in the Republican primary against Sandoval, and he thought Sandoval was a good target for a challenger. Spencer had heard the Democratic Party was recruiting Wooten to run for office and, as a courtesy, Spencer wanted to inform Dodd that he was going to try to recruit Wooten to run as a Republican. Spencer learned Wooten had declined to run as a Democrat.

Spencer testified he telephoned Wooten in mid-December 2007, in advance of the January 2, 2008 deadline to file as a candidate for the March 4, 2008 Republican primary. Spencer told Wooten that he had a "contact" in the area who could get her name out, but Spencer did not mention Clements at that point. Spencer told Wooten the campaign would cost $100,000 to $150,000, and Wooten thought that was a reasonable estimate. Spencer told Wooten about the support he thought her campaign could garner, such as endorsements, grassroots support, and volunteers walking in neighborhoods and handing out campaign materials. Spencer does not

recall if he mentioned the THSC. Spencer told Wooten he would do everything he could to be supportive of her campaign. Spencer testified that most of the estimated $100,000 to $150,000 campaign expense would have to come from Wooten.

On January 2, 2008, Wooten filed as a candidate for the 380th Judicial District Court and appointed attorney Alma Benavides as her campaign treasurer. Sometime prior to January 2, 2008, Wooten called Spencer and asked him to serve as her campaign manager. At the time Wooten hired Spencer as her campaign manager, she had not met him in person. Spencer hired an assistant to help him with campaign management "after we had a candidate and had a campaign up and running."

Spencer acknowledged that at the time he was recruiting Wooten as a candidate for the 380th Judicial District Court, and when she agreed to run for election, Spencer was receiving money from Stacy. He also acknowledged there were probably times when he placed telephone calls to Stacy and Wooten in close proximity. According to Spencer, when he contacted David and Stacy, he did not reveal details about his relationship with Wooten. Spencer testified he did not provide information to David and Stacy about Wooten's campaign, and he did not discuss his "business" with David and Stacy. He did mention to David and Stacy that he was involved in a judicial campaign in Collin County and that they would not be involved in it. He also testified Stacy knew he was working on a campaign, but he did not know if he identified it as the Wooten campaign. He told Stacy it was a contested judicial primary in Collin County, but he testified that it would not be difficult to figure out which campaign because there were not many contested races. David knew Wooten was running for judge. David asked Spencer about the campaign, but Spencer told David that he could not discuss it with him because David had a case pending in the 380th Judicial District Court. When David inquired further about why he could

not be involved in Wooten's campaign, Spencer told him it was because Spencer was working with Stacy, Spencer and David were friends, and Wooten was Spencer's client. David picked up Wooten campaign signs and placed them in his yard, and Spencer went to David's office at some point during Wooten's campaign and saw a Wooten campaign sign there.

Spencer testified that the only thing he spoke to Wooten about that would be closely related to his business with David and Stacy was the issue of parental rights. When asked whether Wooten knew anything about David and Stacy, Spencer testified that he did not believe so. While Spencer indicated he spoke with Wooten at length about campaign strategy, he testified he did not talk to her about the money he was receiving from Stacy because one had nothing to do with the other. Spencer did not think he was placing Wooten in a difficult position; he thought he was protecting her by "partitioning off" his business relationship with David and Stacy from Wooten's political campaign. Spencer denied stating that he "owned" Wooten or that Wooten was going to "fix" David's divorce.

Between January 1, 2008 and March 15, 2008, Stacy paid Spencer $150,000 in the form of checks and wire transfers.[7] Spencer testified this compensation related to his consulting agreement with Stacy, however he indicated the compensation was for services that were not yet performed but were "in progress." According to Spencer, he received these payments for his services at the same time he was serving as campaign manager for Wooten.

Spencer testified that his "champagne" budget for a successful Wooten election campaign was $149,200. Spencer acknowledged at trial that without Stacy's money, he probably would not have been able to pay for all of Wooten's campaign expenses. According to Spencer, Stacy's $150,000 was "put to work to run" Wooten's campaign; however, at that point, he was spending

---

[7] Stacy paid Spencer approximately $15,000 in 2007. That payment was not the subject of a bribery charge.

"his money" on Wooten's campaign. Spencer testified he believed Wooten would pay him back and she did. Spencer testified that Wooten told him she had opened a line of credit to "back" all of her campaign expenses. Spencer wanted to avoid using that line of credit because, when reports of campaign expenditures are filed with the Texas Ethics Commission (Ethics Commission), it apprises the opponent of how funds available to the campaign are being used. In a February 5, 2008 email from Spencer to Wooten and Clements, Spencer stated that Sandoval "raised some money, but I don't think he's in a position to match our resources." Spencer testified that in that email, he was speaking not only of Wooten's campaign account, but also Wooten's line of credit. However, Spencer testified that without Stacy's transfers of money to him before February 5, 2008, Spencer might not have been able to pay Clements or the other expenses of Wooten's campaign incurred by that date or "we might have had a line of credit early."

The first transfer of money from Stacy to Spencer occurred on January 4, 2008, in the amount of $50,000. The payment, which was made without Spencer providing Stacy an invoice for consulting services, occurred with only two months remaining until the Republican primary. Before receipt of that wire transfer, Spencer had $2.39 in his bank account. Spencer paid Clements $7,500 on January 7, 2008 and $7,500 on January 8, 2008. Spencer testified that without the wire transfer from Stacy, he would not have had the money to pay Clements's $15,000 fee, and Wooten would have had to pay Clements's fee directly.

The second transfer of money from Stacy to Spencer occurred on January 30, 2008, in the amount of $25,000. The third transfer of money from Stacy to Spencer occurred on February 14, 2008, in the amount of $25,000. The fourth transfer of money from Stacy to Spencer occurred on February 26, 2008, in the amount of $25,000.

After the March 4, 2008 Republican primary, Spencer and Clements were in contact on March 7, 2008 regarding Clements's $10,000 bonus payable as a result of Wooten's success in the primary election. On March 7, 2008, the fifth transfer of money from Stacy to Spencer occurred in the amount of $10,000. On March 6, 2008, Spencer's bank balance was $2,407.69. After the transfer of $10,000, Spencer's bank balance was $11,707. Within an hour of Stacy's March 7, 2008 wire transfer of $10,000 to Spencer's account, Spencer's wife purchased a cashier's check for payment of Clements's $10,000 victory bonus. Spencer testified he did not recall if he was in contact with David regarding the March 7, 2008 wire transfer. The sixth transfer of money from Stacy to Spencer occurred on March 14, 2008, in the amount of $15,000.

When Wooten announced her candidacy, Spencer and Clements advised her that it would cost a minimum of $100,000 to be competitive in the race. Spencer testified that he billed Wooten about $111,000 for campaign expenses. Copies of Spencer's invoices and his "working copy" of bills to Wooten's campaign were admitted in evidence. Spencer testified that at the time Wooten was raising money after her successful political campaign, she still owed Spencer $80,000. Spencer invoiced Wooten's campaign $4,536.75 on February 20, 2008, $2,409.25 on March 4, 2008, $10,009.25 on March 23, 2008, $12,000 on April 16, 2008, $15,000 on April 25, 2008, and $5,000 on May 26, 2008. On May 29, 2008, Spencer invoiced Wooten's campaign $84,368.75, with credits and adjustments of $51,929.82 for payments between February 13, 2008 and April 28, 2008, leaving a balance due of $37,438.93. Spencer invoiced Wooten's campaign $9,241.50 on June 3, 2008. By invoice dated July 1, 2008, Spencer's cumulative bill to Wooten showed she still owed Spencer $33,369.91.

In the cover letter forwarding Spencer's May 29, 2008 invoice to Wooten, he advised that "we recognize your July filing deadline with the Ethics Commission, and will render a

supplemental Invoice to your office in June." Spencer testified he knew Wooten needed information regarding amounts spent or incurred for the benefit of her campaign in order to report these items properly on her campaign finance report filed with the Ethics Commission. Spencer believed a candidate is required to report not only campaign contributions and expenses on campaign finance reports, but also must list funds the candidate holds in a campaign account on a given date. Spencer testified he did not prepare Wooten's campaign finance reports, but when asked, he provided the information she needed to prepare the reports.

Wooten did not have to draw down on her line of credit until sometime after the March 4, 2008 Republican primary. While Spencer testified he did not know whether Wooten drew on her line of credit for the first time on August 19, 2008 when she paid Spencer $33,369, documents admitted in evidence indicate Wooten's line of credit was opened on August 13, 2008.

Spencer's consulting agreement with Stacy, dated October 1, 2007, was admitted in evidence. Also admitted in evidence was Spencer's October 15, 2009 "Engagement Letter for Outsourced Marketing Services" relating to consulting services to be provided by Spencer to TDI, David's employer. Spencer testified regarding certain aspects of those two documents. The consulting agreement was not signed by Stacy and was dated prior to the date Spencer testified he first met Stacy on October 2, 2007. The TDI Engagement Letter for Outsourced Marketing Services was signed by William Johnson, Chief Executive Officer of TDI, on October 14, 2009, however the date of Johnson's signature was the day before the date of the engagement letter. Spencer's consulting agreement with Stacy and the TDI engagement letter each indicate the term of the agreement ended on December 31, 2009. Spencer believed Stacy paid him no money in connection with the consulting agreement after March 15, 2008.

Spencer testified that he made mistakes in preparing Stacy's consulting agreement. The consulting agreement dated October 1, 2007, and the TDI Engagement Letter for Outsourced Marketing Services dated October 15, 2009, both contain an identical phrase relating only to TDI: "[a]ny additional time spent on TDI's behalf is part and parcel to, and inclusive of this engagement." Spencer initially testified that in October 2007, he did not know the TDI company name, but he later changed his testimony and indicated that David gave him a business card at their October 2, 2007 meeting. Spencer denied that the reason Stacy's consulting agreement and the TDI engagement letter contain the same language concerning "additional time spent on TDI's behalf" was that when he received a subpoena and produced documents to the State in November 2009, he fabricated Stacy's consulting agreement to "paper" the $150,000 Spencer received from Stacy. Spencer denied that some of the work the consulting agreement indicates he was to perform for Stacy was actually work he was to perform pursuant to his Engagement Letter for Outsourced Marketing Services with TDI; he testified that he thought Stacy was interested in the same subject matter because she and David had an equity interest in TDI.

Spencer also testified that he made mistakes in the paperwork supporting invoices to Stacy. For example, Spencer testified that, according to the schedule of payments due under the consulting agreement with Stacy, she was to pay him $25,000 "per project," and Stacy "roughly" paid $100,000 according to the schedule. An August 1, 2008 "summary" invoice from Spencer to Stacy was admitted in evidence. That summary shows that for the "balance" of $100,000, credits were applied for the following transfers of money to Spencer: $25,000 on February 5, 2008; $25,000 on February 14, 2008; $15,000 on March 4, 2008; and $10,000 on March 7, 2008. Spencer did not include the $25,000 transfer on February 26, 2008, however that transfer is

handwritten on Stacy's copy of the "summary" invoice. The "summary" invoice did not include the January 4, 2008 wire transfer of $50,000 from Stacy.

One of the "projects" for which Spencer testified he was paid $25,000 or more by Stacy involved possible equity investment by Stacy in Down Hole Injections (DHI). Spencer provided information to Stacy concerning DHI which included eighteen pages of DHI financial statements contained in a private offering memorandum given to Spencer in mid-2007 by an individual living in Dripping Springs, Texas. By letter dated April 7, 2008, Spencer advised Stacy he did not believe DHI was a good investment for her. Another "project" for which Spencer testified he was paid $25,000 by Stacy involved analysis of the rural electricity marketplace. By letter dated July 10, 2008, Spencer sent Stacy a summary analysis of the "U.S. Electric Co-Op Market and Potential Venture to Acquire Broadband Service Delivery Rights." Spencer acknowledged that the contents of that letter were taken in large part from an article published in the Harvard Journal of Legislation. Spencer testified he also provided information to Stacy in July 2008 concerning new pumping technology, the U.S. electric marketplace, and ventures related to Smart-Grid technology, based upon materials he had previously received.[8] With regard to the "project" concerning parental rights for which Stacy was to pay Spencer $25,000, a power point presentation was introduced in evidence that described creation of a for-profit internet service provider that could "sustain advocacy of parental rights," and, according to the presentation,

---

[8] Stacy's brother, Scott Nicholas Stine (Stine), testified that Stacy is an owner of the family business, and she had other individual business ventures in addition to the family business. He testified that his family has hired consultants to advise on new investments, and such use of consultants is a "standard thing" in the oil industry. The consultants' fees would be divided among the family members when the consultants were hired for family business. When Stine hired consultants on his individual business deals, he paid those consultants. Stine testified that he vetted business consultants before they were hired by meeting with them and considering recommendations.

According to Stine, the family business was sold on November 30, 2007 and the $6,375,000 proceeds were divided between Stacy, Stine, and their sister. To his knowledge, Stacy never invested in Smart Grid technology. Stacy had not shown Stine the DHI and Smart Grid documents provided her by Spencer, however Stine reviewed those documents before Stacy's trial at the request of Stacy's attorney.

would gross $46,000,000 in revenue during a one year period, although Spencer testified he did not have experience creating an internet service provider.

Spencer testified that in early 2008, he began doing work with TDI, which he then would have known was David's employer. The first time Spencer was paid by TDI was in July or August 2008. He was initially asked to obtain a release of a lien on an account. Later, he was asked to retain a lobbyist on behalf of TDI and to obtain sales contracts. An August 26, 2008 letter from Spencer to TDI regarding "Proposed Legislative/Regulatory Strategic Plan" contains identical language to a July 10, 2008 communication from Spencer to Stacy regarding "Analysis of the U.S. Electric Co-Op Market and Potential Venture to Acquire Broadband Service Delivery Rights."

Spencer testified regarding the events surrounding Wooten's recusal in March 2009 from David's SAPCR. Benavides, Wooten's campaign treasurer and an associate with the law firm with which Wooten practiced before her election, filed an answer on behalf of Jennifer on February 27, 2009 at 9:59 a.m., in advance of a March 2, 2009 hearing before Wooten. According to the phone records admitted in evidence, David phoned Spencer at 1:35 p.m. and 8:30 p.m. on February 26, 2009. On February 27, 2009 at 8:56 a.m., Spencer received a text message from David. At 9:07 a.m., Spencer sent a text message to Benavides. At 9:46 a.m., Spencer and David exchanged text messages. Thereafter, Spencer telephoned Benavides, and Spencer then called David. At 11:03 a.m., Spencer phoned David. David then called Spencer and spoke to him for several minutes. Benavides returned Spencer's telephone call. Spencer then called David.

Spencer acknowledged at trial that David contacted him to advise him that an answer had been filed for Jennifer in the SAPCR by Benavides. Spencer testified that he "may have known"

that for a period of time, Wooten would not preside over cases in which Benavides was counsel. Spencer stated that he contacted Benavides regarding her appearance on behalf of Jennifer. Spencer indicated that he cautioned Benavides about involvement in the SAPCR; specifically, he warned her "not to go in" the case. Spencer said he was giving Benavides "a read on the case [he] thought she was getting into" and that he thought the case was a "real mess."[9] Benavides asked Spencer if she could call him back with the law firm's managing partner, Basinger, on the line. Benavides and Basinger called Spencer, and Spencer told them they did not want to be on this case.

Spencer and David spoke on the phone on February 28, 2009. Spencer testified he did not speak with Wooten on February 26, 27, 28, or March 1, 2009. A hearing was scheduled in the SAPCR before Wooten on March 2, 2009. There were a number of text messages between Spencer and David on March 2, 2009. A transcript of the March 2, 2009 hearing was admitted in evidence. As she began the hearing, Wooten stated:

> I had a chat with Judge Oldner, our administrative judge, about whether or not it was appropriate for me to hear this, especially in light of Ms. Benavides appearing on the case. Not to blame Ms. Benavides, but I was with her firm up until right about the end of last year. So, for various reasons, I have to recuse myself off this case.

Wooten signed a recusal in the SAPCR on March 4, 2009.

Spencer testified he did contact Wooten in early March 2009 prior to her recusal. He told Wooten he was going to be in the area on a trip and wanted to take her to lunch. Records introduced in evidence established Spencer also called the office of Judge Oldner during this period of time, and Spencer testified he did not dispute calling Oldner's office. He testified that

---

[9] Spencer was at least generally familiar with David's SAPCR proceeding. Spencer acknowledged discussing the case with David and testified that David had sent him pleadings in the case.

at some point he tried to recruit Oldner to run for an appellate bench, although he did not know whether that was the subject of this particular phone call. Spencer testified that he did not think it was accurate that Oldner would have control over "where David's case [was] going" after Wooten's recusal. After Wooten recused herself in the SAPCR, Spencer understood there was a case involving Stacy and Suster that remained pending in Wooten's court, and Spencer acknowledged that he discussed that case with David.

A June 9, 2009 email exchange between David and Spencer was admitted in evidence regarding a June 8, 2009 decision of the United States Supreme Court in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), a case involving judge recusal. Spencer's email to David included the following text from an article about the decision:

> Today's decision by the U.S. Supreme Court that judges who receive campaign contributions large enough to create the appearance of bias should recuse themselves. . . . In *Caperton v. Massey*, the nation's high court ruled 5-4 that because a West Virginia Supreme Court justice received $3 million in campaign contributions from an energy company executive, the judge should not have taken part in a decision affecting the executive's company.

Spencer emailed David that "I think you'll understand why I'm interested in this subject matter." David then emailed "the entire story" to Spencer. Spencer denied that the reason he and David were interested in the news article was because Stacy's money was used to finance Wooten's campaign.

### Deanna Kedzie

Deanna Kedzie, a certified public accountant, testified that her practice focuses upon tax accounting and Stacy was her client. Kedzie testified about a 2008 income and expense report dated March 16, 2009 that was prepared by Stacy. According to Kedzie, the report indicates legal fees of $226,602.96 were incurred in 2008 relating to divorce and child custody issues. Kedzie testified that Stacy wanted to deduct from 2008 taxable income a total of $226,773 for

legal and professional fees.  Kedzie also testified about a March 31, 2008 email to her from Stacy, relating to Stacy's 2007 tax return, in which Stacy wrote that her legal expenses were high "THANKS TO MY STEP CHILDREN'S LITIGIOUS/ABUSIVE/NARCISSIsTC[sic]/GOLD DIGGING MOTHER" and inquired why legal fees "defending my home and family" could not be deducted from taxable income on her 2007 income tax return.  Kedzie testified that none of Stacy's legal fees relating to divorce and child custody issues were actually deducted from taxable income on her income tax returns.

Kedzie testified she was unaware that Stacy had hired Spencer to perform consulting services.  None of the backup documentation for calendar years 2007 and 2008 income and expense that Stacy provided to Kedzie for purposes of income tax return preparation contained any indication Stacy paid Spencer for consulting work during that period.  According to Kedzie, if Stacy was unsure about how to address the tax aspects of an expenditure or deduction, Stacy would typically contact Kedzie for advice; and if Stacy had needed any advice on how to address the tax aspects of a $150,000 consulting agreement, Stacy would most likely have contacted Kedzie because Kedzie prepared Stacy's personal and business tax returns.  Stacy did not seek advice from Kedzie concerning the consulting agreement with Spencer.

<u>Kyle Basinger</u>

Attorney Kyle Basinger testified that Wooten previously had operated a Collin County office for Basinger's law firm.  Basinger's law firm formalized separation from Wooten's Collin County office on September 1, 2008, after Wooten won the Republican primary for judge of the 380th Judicial District Court.

Before the 2008 election, Basinger spoke with Wooten several times about her interest in running for judge in Collin County.  Initially Wooten talked to Basinger about running as an

Independent. Basinger told her he saw very little chance of her winning a Collin County judicial election as an Independent. Basinger learned of Wooten's decision to run for judicial office just before the filing deadline in January 2008. Basinger was concerned that it seemed a last minute decision by Wooten. Basinger talked to Wooten about the difficulty of raising campaign funds to oppose an incumbent judge in Collin County, and told her that it was extremely difficult to defeat an incumbent judge in Collin County.

Benavides, an associate in Basinger's law firm, served as Wooten's campaign treasurer. After her election, Wooten requested that members of Basinger's law firm not appear in her court for a period of nine months in order to avoid the appearance of impropriety. With respect to a Basinger firm case pending in Sandoval's court at the time Wooten assumed office, Basinger testified that his office would contact Wooten's court coordinator to advise her of the pending case, and the case would be ministerially transferred to another Collin County judge.

Basinger represented Jennifer with regard to a motion to modify filed in the SAPCR involving David and Jennifer that was pending in Wooten's court. On February 27, 2009, at 9:59 a.m., Basinger's law firm filed pleadings on behalf of Jennifer concerning the motion to modify. Basinger received a telephone call from Spencer at approximately 10:30 a.m. on February 27, 2009. Basinger was aware Spencer had served as Wooten's campaign manager. Basinger testified this was the only time he had received a telephone call from Spencer, and he was surprised Spencer was calling him and that Spencer had his telephone number. Basinger had only met Spencer one time prior to this telephone call. Spencer asked that Basinger consider withdrawing from the SAPCR involving David and Jennifer. Spencer's position was that Basinger needed "to get off this case." Basinger told Spencer he could not "just tell me I need to get off the case." Spencer told Basinger that he did not want to be a part of this case and that

Basinger had "to trust [him] on that." Basinger told Spencer that he had to give Basinger "more than that." Spencer said there was an ongoing investigation of Sandoval in Austin, but Basinger told Spencer that Sandoval was not hearing the SAPCR. Basinger told Spencer that he had given Basinger no reason to get off the case, and that was "pretty much the way we left it." Basinger continued to represent Jennifer after the phone call from Spencer.

On March 3, 2009, Basinger's law firm filed a motion to recuse Wooten in connection with the pending motion to modify the SAPCR. Basinger's and Benavides's names were listed as counsel on that motion. On March 4, 2009, Wooten granted the motion to recuse.

Jennifer approached Basinger regarding his firm representing her in two additional civil litigation matters, one pending in Collin County and the other pending in Dallas County. The civil litigation in Collin County was related to the SAPCR between David and Jennifer; the case was filed by Stacy against Jennifer and Suster, who was attempting to collect attorney's fees Sandoval had ordered David to pay Jennifer in the SAPCR. That lawsuit was originally filed in the County Court at Law No. 4 of Collin County. Because it was related to the SAPCR involving David and Jennifer, the case was transferred to Wooten's court in which the SAPCR case was pending.

Basinger and Benavides are listed as counsel on an April 23, 2009 pleading filed on behalf of Jennifer in the lawsuit filed by Stacy against Jennifer and Suster that was pending before Wooten. Basinger filed a motion for protection regarding Stacy's attempt to depose Jennifer. Wooten denied Jennifer's motion for protection. On May 8, 2009, Basinger filed a motion to recuse Wooten in Stacy's lawsuit against Jennifer and Suster. Basinger anticipated the motion to recuse would be granted because Wooten had recused herself previously with regard to

the motion to modify filed in the SAPCR involving David and Jennifer, and there were overlapping facts in Stacy's lawsuit against Jennifer and Suster.

Unlike the prior motion to recuse, however, Wooten did not voluntarily recuse herself from Stacy's lawsuit against Jennifer and Suster. Judge G. Calhoun, Jr. was appointed to hear the motion to recuse Wooten in that matter. On June 29, 2009, Basinger forwarded correspondence to Wooten withdrawing Jennifer's motion to recuse. Basinger testified that his law partner had met with Jennifer, and the decision had been made to withdraw the motion to recuse Wooten. Basinger testified that he wanted Wooten to continue as the judge presiding over this case, and he thought she would be a "great judge" on the case. However, Basinger testified that, at that time, he had no idea of any allegation that Spencer helped finance Wooten's campaign, and had he known of and believed such an allegation, it would have affected his view of Wooten. Basinger testified that after the motion to recuse Wooten was filed in Stacy's lawsuit against Jennifer and Suster, Stacy nonsuited her case.

### Hank Clements

Hank Clements, an attorney and registered lobbyist in Texas, testified that his firm provides political and legislative consulting services, including lobbying. Clements also provides services to candidates for public office, including campaign management, direct mail advertisement, media strategies, and speech preparation. Prior to 2008, Clements had worked on approximately six judicial campaigns.

In the spring of 2007, Clements met Spencer in the office of a legislator. Clements believes Spencer was there with regard to a family law issue. Spencer told Clements he was interested in managing political campaigns, advocating for parental rights legislation, and getting "bad judges" off the bench. It was Clements's understanding from speaking with Spencer in the

–29–

fall of 2007 that Spencer wanted to field a candidate in a judicial race. Spencer specifically asked if Clements had ever managed a campaign in Collin County, and Clements advised Spencer that he had. Spencer told Clements there were a number of judges that had been targeted by a group he belonged to because the judges were opposed to the family law agenda the group was trying to advocate at the legislature. Clements recalled specifically that Spencer wanted to "go after" and defeat Sandoval. Clements understood Spencer had been unable to find a candidate to run against Sandoval, but Spencer identified Wooten as a potential candidate who was considering entering the race. Spencer wanted Clements to talk to Wooten regarding the magnitude of such a campaign. Clements spoke on the telephone with Wooten toward the end of 2007, and he met with her on a Saturday in December 2007. Clements gave Wooten an idea of the time commitment and cost required for an effective political campaign. Clements also told Wooten it would require a substantial commitment on Wooten's part to defeat an incumbent judge, and that the campaign would cost $60,000 to $70,000 or more.

By late December 2007 or early January 2008, Clements knew Wooten was going to run against Sandoval in the Republican primary for judge of the 380th Judicial District Court. The primary election was scheduled for early March 2008, and Clements testified that was a short time in which to execute the campaign. Although Spencer had never managed a political campaign, Clements testified Spencer wanted to run Wooten's campaign and Wooten hired Spencer as her campaign manager. Spencer hired Clements as a subcontractor to handle media, prepare a campaign plan, develop overall strategies, and design a direct mail plan. Clements was to be paid $15,000 for the scope of work and a $10,000 victory bonus if Wooten won the race. Clements received cashier's checks for payment of his fees as follows: $7,500 on January 7,

2008, $7,500 on January 8, 2008, and $10,000 on March 7, 2008 after Wooten defeated Sandoval in the March 4, 2008 Republican primary.

Clements did not send his bills directly to Wooten. Clements did not discuss individual campaign expenditures with Wooten; that would have been done by Spencer and the campaign treasurer. Clements testified that it is important for a campaign manager to obtain the candidate's "buy off" on individual campaign expenditures because the expenditures must be reported to the Ethics Commission. According to Clements, management of a campaign is characterized as "turnkey" when the candidate pays a fee to a campaign manager or political consultant, and the manager or consultant is then responsible for paying vendors and service providers. Clements indicated that Spencer provided turnkey management of Wooten's election campaign.

In other campaigns, Clements assisted the candidate in preparing campaign finance reports to be filed with the Ethics Commission. He was not asked to review Wooten's campaign finance reports. According to Clements, campaign finance reports generally itemize the amount of campaign contributions and expenditures. Campaign finance reports filed with the Ethics Commission are public records, and the public can view the reports to see how candidates raised and spent their campaign funds.

The bank records for the "Suzanne H. Wooten for Judge Campaign" were admitted in evidence. Those records indicate that on February 4, 2008, the balance in the campaign account was $2,366, and on February 5, 2008, the balance in the account was $1,933. Clements recollects he received a telephone call from Spencer regarding how much money Sandoval had raised in his campaign and that Spencer was "not impressed" with the amount. Sandoval's Campaign Finance Report filed with the Ethics Commission on February 4, 2008 was admitted

in evidence. That report reflected Sandoval had raised $12,575 in campaign contributions, had expended $8,997.08, and on February 4, 2008, his campaign account had a balance of $4,231.37. Spencer sent an email to Wooten and Clements regarding Sandoval's February 4, 2008 Campaign Finance Report. In that email, Spencer said Sandoval had "raised some money," but Spencer did not think Sandoval was "in a position to match our resources." Clements did not know what Spencer meant by his reference to "resources" in that email. Spencer did not tell Clements that there were contributors Spencer could go to for money, but that was Clements's interpretation of the email. It sounded to Clements like there were some contributors who could be "tapped" in order to raise more campaign funds than Sandoval. Clements testified he had no role in raising money for Wooten's campaign or in managing the finances of the campaign.

Records regarding paid political advertisements for the Wooten campaign on local radio stations were admitted in evidence. For example, a $6,000 cashier's check from Spencer for payment for radio advertisements airing on a radio station from February 25 through February 28, and on March 3, 2008, was admitted in evidence. The invoice for the radio advertisements was dated March 10, 2008. A $4,000 cashier's check from Spencer for payment for radio advertisements airing on another radio station from February 25 through February 28, and on March 3, 2008 was also admitted in evidence. The contract confirmation for that radio advertising was dated February 22, 2008, and the invoice for that radio advertising was dated March 10, 2008. An invoice from Spencer to Wooten's campaign for the $6,000 and $4,000 radio advertisement expenses was dated March 23, 2008. A cashier's check dated February 26, 2008 from Spencer in the amount of $14,454.25 was presented as payment for radio advertisements for Wooten's campaign that aired on three other radio stations from February 24 through March 3, 2008, pursuant to contracts entered into at the end of February 2008. A

February 4, 2008 cashier's check from Spencer to Cartwright Signs and T-Shirt Printing in the amount of $4,036.75 was admitted in evidence. Documents on which Wooten gave approval for campaign expenditures and edited or approved campaign advertisements and media materials were admitted in evidence. Clements testified with regard to this evidence that there is nothing improper with Spencer paying a campaign expense and billing the candidate later for that expense. Although not holding himself out as an expert on campaign finance reports, Clements testified that a campaign manager could bill the candidate later for an invoice paid by the campaign manager, but he believed the law required that the expense incurred be posted on the candidate's campaign finance report. Clements further testified that even if a consultant decided not to send a candidate a bill, the candidate nevertheless would be required to itemize campaign expenses on the campaign finance report covering the time period the expenses were incurred.

### Ian Steusloff

Ian Steusloff, an assistant general counsel for the Ethics Commission, testified that the Ethics Commission is an agency that, among other things, administers laws relating to campaign finance, ethics disclosure, and regulation of lobbyists. It also serves as an enforcement agency.

Steusloff testified regarding filings with the Ethics Commission that candidates and officeholders are required to make. Candidates for election to a judicial office are required to file campaign finance reports. Those reports show campaign contributions, campaign expenditures made from a campaign account, campaign expenditures made from personal funds, and loans to a campaign. Typically candidates must file campaign finance reports on January 15th and July 15th. If opposed in an election, candidates must also file campaign finance reports

thirty days and eight days before the election.[10]  Candidates are required to swear the information provided in a campaign finance report is true and correct.  The campaign finance reports filed by a judicial candidate are public records, and the Ethics Commission posts those reports on its internet website.

Steusloff testified that contributions to a judicial campaign must be individually itemized on the campaign finance report if the contribution, whether money or in-kind, exceeds $50.  A candidate must also disclose on the campaign finance report outstanding loans to a judicial campaign.  Steusloff explained that campaign expenditures of over $50 must be itemized on the campaign finance report.  For disclosure purposes, an expenditure is deemed made when the amount of the expenditure is readily determinable.  Steusloff testified that, in 2008, when an individual or entity made an expenditure of more than $100 that benefitted, but was independent from, a campaign, such as paying for advertising that benefitted a candidate, the individual or entity was required to file a report with the Ethics Commission disclosing the expenditure and send a report of the expenditure to the candidate.  According to Steusloff, if an employee of a candidate makes an expenditure for the campaign, the expenditure would be itemized on the campaign finance report as if the expenditure had been made by the candidate.  If, however, the candidate hired an independent consultant and delegated authority to the consultant to make decisions concerning campaign expenditures without the candidate's approval, Steusloff testified the candidate would disclose on the campaign finance report payments made to the consultant for consulting services but not itemize the individual expenditures made by the consultant to specific vendors.

---

[10] Steusloff testified that if a candidate files a statement that she is not going to accept or spend more than five hundred dollars on an election, she is not required to file a pre-election campaign finance report thirty days and eight days before the election.

Steusloff testified that in judicial races, there are limits on campaign contributions. The limit depends on the population of the judicial district. If the population in the judicial district is between 250,000 and one million, as in Collin County in 2008, the contribution limit is $2,500. According to Steusloff, if an individual lends money to a candidate specifically to support the candidate's campaign, the loan counts against the campaign contribution limit for that individual; however, that is not the case when the candidate obtains a campaign loan from a bank. Additionally, there are limits on a candidate's campaign expenditures, which apply whether the candidate is using campaign contributions or personal funds. When a candidate pays campaign expenditures from personal funds, there is a limit on reimbursement of those expenditures from campaign contributions; the limit is five times the maximum permissible campaign contribution. Therefore, where the campaign contribution limit for a judicial race is $2,500, the total amount of reimbursement from campaign contributions of a candidate's out-of-pocket campaign expenditures is $12,500.

Wooten's campaign finance reports were admitted in evidence. Wooten's Campaign Finance Report for the period January 25, 2008 through February 23, 2008 indicated she had received a total of $10,425 in campaign contributions, with total political expenditures of $11,734.41. Wooten's Campaign Finance Report for the period February 24, 2008 through June 30, 2008 indicates she received $59,755.19 in campaign contributions and expended $65,515.91. Wooten's January 11, 2009 Campaign Finance Report filed for the period July 1, 2008 to December 31, 2008 indicates she received campaign contributions of $5,150 and expended $42,419.91.

Wooten's January 11, 2009 Campaign Finance Report indicates payments to Spencer in the amounts of $1,500 and $7,550 for "turnkey mgmt svcs fees and costs–per invoice[s]."

Earlier campaign finance reports and amended campaign finance reports filed by Wooten in 2009 disclose the following payments to Spencer: an August 28, 2008 payment in the amount of $33,369,91 for "turnkey mgmt svcs fees and costs–per invoice"; a February 13, 2008 payment in the amount of $4,002.32 for signs and fees; a February 22, 2008 payment in the amount of $4,527.50 for campaign material and fees; a March 7, 2008 payment in the amount of $2,400 for a direct mailer; a May 29, 2008 payment in the amount of $5,000 for "turnkey management svcs fee and costs–per invoice[s]"; June 24, 2008 payments of $5,241.50 and $2,700 for "turnkey mgmt svcs fees and costs–per invoice"; a June 30, 2008 payment in the amount of $7,550 for "turnkey management services fees and costs–per invoice"; and a June 30, 2008 payment of $1,500 for "turnkey management services fees and costs–per invoice." The campaign finance reports also include campaign expenditures for "CBS radio buy–per invoice" on March 31, 2008 in the amount of $10,000, "WBAP radio buy fee" on April 17, 2008 in the amount of $12,000, and "radio buy and direct mail–per invoice" on April 28, 2008 in the amount of $14,000. A campaign finance report reflects a "personal loan" from Wooten to the campaign on August 28, 2008 in the amount of $33,369.91, matching the August 28, 2008 payment of $33,369.91 to Spencer for "turnkey mgmt svcs fees and costs–per invoice."

## Kyle Swihart

Kyle Swihart, a certified fraud examiner and a forensic auditor employed by the office of the Texas Attorney General, testified that he investigates allegations and complaints of white-collar crime relating to public integrity and money laundering. His investigation of Stacy included review of bank records; phone records; campaign finance reports; credit card statements and documents establishing a credit card account; invoices; payments made by Wooten to Spencer; and records of emails and other forms of communication.

A chart created by Swihart containing a summary of the evidence he relied upon was admitted in evidence. That chart contained a summary of bank records, invoices for services or products provided to Wooten's campaign, transfers of money from Stacy to Spencer, the dates when products or services benefitting the Wooten campaign were purchased or rendered, and the dates Spencer invoiced Wooten's campaign. The summary of the evidence spans the period of January 1, 2008, the day before Wooten filed her candidacy for judge of the 380th Judicial District Court, and August 29, 2008, when Wooten wrote a check in the amount of $33,369.91 from her line of credit to Spencer. The records Swihart reviewed establish Spencer made six deposits to his bank account of funds transferred to him by Stacy in the form of wire transfer or check.

On January 3, 2008, Spencer had $2.39 in his bank account and Wooten had $25 in her campaign account. On January 4, 2008, $50,000 was deposited in Spencer's bank account from Stacy's first transfer of money to him. Without the money transferred by Stacy to Spencer on January 4, 2008, Spencer did not have funds in his bank account, and Wooten did not have funds in her campaign account, for Spencer to make payment by cashier's check to Clements on January 7, 2008 in the amount of $7,500 and on January 8, 2008 in the amount of $7,500. On January 23, 2008, Spencer had a balance of $7,656.31 in his bank account remaining from the January 4, 2008 transfer of money from Stacy, $16,856.37 having been spent by Spencer on Wooten's campaign.

On February 4, 2008, a payment from Stacy to Spencer in the amount of $25,000 was posted to Spencer's bank account. Before this deposit, Spencer had an account balance of $5,545.51, and Wooten had a balance of less than $3,000 in her campaign account. After that deposit, the balance in Spencer's bank account was $25,692.30. The records show that on

February 5, 2008, Spencer began using the $25,000 for Wooten's campaign, including an expenditure of $2,345 for an advertisement in the Plano Profile magazine, and payments of $4,036.75 and $3,877.32 to Cartwright Signs. Without Stacy's February 4, 2008 payment of $25,000 to Spencer, these campaign expenses could not have been paid from either Spencer's bank account or Wooten's campaign account.

On February 13, 2008, Spencer had $1,180.97 in his bank account and Wooten had $5,885.06 in her campaign account. On February 15, 2008, another $25,000 check from Stacy was posted to Spencer's bank account. After deposit of that check, Spencer's bank balance was $25,000.92. Spencer used the money in his account after that deposit to purchase cashier's checks on February 20, 2008 totaling $10,000 to pay invoices for radio advertisements. Absent the $25,000 from Stacy, neither Spencer's bank account nor Wooten's campaign account had sufficient funds for payment of the radio stations' advertising invoices.

On February 26, 2008, a $25,000 wire transfer from Stacy posted to Spencer's bank account. Prior to that deposit, Spencer had $5,565.18 in his bank account and Wooten had $5,166.58 in her campaign account. The day Stacy's wire transfer was made, Spencer made additional radio advertisement purchases in the amount of $14,454.25, as well as payments to the THSC Political Action Committee for a mailer and to an assistant. Without the $25,000 payment from Stacy, Spencer did not have sufficient funds in his bank account, and Wooten did not have sufficient funds in her campaign account, to pay those campaign expenses.

On March 7, 2008, after the March 4, 2008 Republican primary, Stacy wire-transferred a fifth payment to Spencer in the amount of $10,000. At the time of that transfer, Spencer had $11,707 in his bank account, and Wooten had $2,710.08 in her campaign account. Approximately one hour after the $10,000 wire transfer, Spencer purchased a cashier's check in

the amount of $10,000 made payable to Clements. A sixth payment by wire transfer in the amount of $15,000 was made by Stacy to Spencer on March 13, 2008. On March 14, 2008, that payment was posted to Spencer's bank account.

Swihart reviewed phone and email records of Stacy, David, Clements, Spencer, and Wooten. Swihart testified regarding the dates and times of communications among those individuals and others. The first communication Swihart was able to document between Spencer and David and Stacy was September 21, 2007. Swihart was able to document a telephone call from Wooten to Spencer on December 20, 2007. Swihart testified regarding communications occurring around the dates of payments from Stacy to Spencer. Swihart also testified regarding communications occurring around the dates of events in matters before the 380th Judicial District Court after Wooten became judge of that court.

At 3:40 p.m. on January 2, 2008, Wooten filed as a candidate for the 380th Judicial District Court. Moments before that filing, Wooten spoke to Spencer by telephone. After Wooten filed as a candidate, Spencer communicated with David. Between 6:49 p.m. and 9:45 p.m. that night, Spencer communicated with David on David's cell phone, with Wooten on her cell phone, and with David, Stacy, or both, on the telephone at the Cary home.

At 10:17 a.m. on January 3, 2008, Paladini Financial requested a third-party wire transfer from one of Stacy's accounts to Spencer in the amount of $50,000.[11] There were two attempts by Spencer to reach David and Stacy's home phone during that day, and David spoke to Spencer from 1:13 p.m. to 1:23 p.m. At 4:49 p.m., Stacy was sent new wiring instructions because the

---

[11] Wendy Kelly, an investment analyst at the financial planning firm of Paladini Financial, testified that Stacy was a customer of Paladini Financial. On the morning of January 3, 2008, Stacy requested that Kelly wire $50,000 from one of her accounts to Security State Bank, Fredericksburg, Texas, for the benefit of Spencer. The wire transfer did not successfully transmit. Kelly contacted Stacy and advised her that the wire transfer had failed and that there was additional paperwork Stacy needed to complete before a third-party wire transfer could be accomplished. Stacy then transferred money from one of her accounts to an account at Tolleson Private Bank, which was able to wire transfer $50,000 to Spencer.

earlier wire transfer could not be completed.  On January 4, 2008, the date of the first wire transfer to Spencer from Stacy, Spencer had three telephone communications with someone on David and Stacy's home phone.  Swihart assumed those conversations were with Stacy as they occurred during the work day; David worked outside the home and Stacy had an office in her home from which she worked.  After the wire transfer of $50,000 was posted to Spencer's account at 4:34 p.m., Spencer telephoned Wooten's office.  Thereafter, there was a brief telephone call to Spencer from David.

On January 29, 2008, the night before the second payment by Stacy to Spencer, Spencer telephoned David's cell phone.  Immediately thereafter, either David or Stacy telephoned Spencer from David and Stacy's home phone.  Spencer then telephoned Wooten.  After the telephone call to Wooten, Spencer telephoned David and Stacy's home.  Stacy made a second payment to Spencer on January 30, 2008, and Spencer deposited that payment on February 1, 2008.  That payment posted to Spencer's bank account on February 4, 2008. On February 5, 2008, Spencer sent an email to Wooten that Sandoval "cannot match our resources," even though Wooten had raised only $3,620 from campaign contributions at that time.

On February 14, 2008, Stacy made her third payment to Spencer.  On that day, Spencer exchanged text messages by phone with David between 5:12 p.m. and 5:23 p.m.  Between 5:34 p.m. and 5:46 p.m., Spencer then communicated in succession with Wooten, Clements, and David.  Stacy's third payment to Spencer posted to his account on February 15, 2008.

On February 26, 2008, Stacy made her fourth payment to Spencer.  At 4:41 a.m., Spencer's assistant confirmed to Spencer by email that radio advertising time had been purchased for Wooten's campaign.  At 5:24 a.m. and 6:59 a.m., David received text messages from Spencer.  At 9:17 a.m., Stacy sent instructions to Tolleson Private Bank to wire $25,000 to

Spencer. At 2:14 p.m., the wire transfer was posted to Spencer's account. At 2:37 p.m. and 2:53 p.m., Spencer's wife, Kipling Spencer, purchased cashier's checks for payment of Wooten campaign expenses from the funds wired to Spencer's account by Stacy.

Swihart testified regarding telephone calls from TDI, David's place of employment, to Wooten's law office prior to her election as judge. There were a total of four telephone calls, with the longest being two minutes and fifty-four seconds. The first telephone call occurred on January 21, 2008 and the last call occurred on February 25, 2008. Swihart testified there were also telephone calls between David's cell phone and Wooten's law office, totaling twelve to fifteen minutes.

On March 4, 2008, Wooten won the Republican primary. On March 7, 2008, Stacy made the fifth payment to Spencer. On March 7, 2008, between 7:07 a.m. and 8:29 a.m., Spencer text-messaged four times with David. Clements text-messaged Spencer at 8:17 a.m. David and Stacy had three phone conversations between 8:45 a.m. and 9:10 a.m. Between 9:23 a.m. and 10:02 a.m., Spencer and David exchanged thirteen text messages. At 10:47 a.m., Stacy attempted to reach David by telephone. At 10:58 a.m., Stacy sent instructions to Tolleson Private Bank to wire $10,000 to Spencer. At 11:40 a.m., David text-messaged Spencer. At 2:51 p.m., the wire transfer of $10,000 posted to Spencer's bank account. Between 3:21 p.m. and 3:52 p.m., Spencer and David exchanged eleven text messages. At 3:59 p.m., Kipling Spencer purchased a cashier's check made payable to Clements in the amount of $10,000.

Between 6:24 p.m. and 6:31 p.m. on March 13, 2008, the day of the sixth payment from Stacy to Spencer, Spencer text messaged David six times. At 9:41 p.m., Stacy sent instructions by email to Tolleson Private Bank to wire Spencer $15,000. On March 14, 2008, the sixth payment from Stacy to Spencer in the amount of $15,000 was posted to Spencer's bank account.

On January 2, 2009, Wooten was sworn in as judge of the 380th Judicial District Court. At 9:59 a.m. on February 27, 2009, Benavides's pleading regarding her appearance on behalf of Jennifer in the SAPCR case pending in Wooten's court was file-stamped. At 11:03 a.m., there was a one-minute phone call between Spencer and David's cell phone. At 11:04 a.m., there was a two-minute telephone call from Spencer to Benavides's cell phone. At 11:06 a.m., Spencer attempted to call David. Between 11:08 a.m. and 11:13 a.m., there was a telephone call from David to Spencer. Between 11:14 a.m. and 11:17 a.m., there was a telephone call from Spencer to Benavides. From 11:18 a.m. to 11:21 a.m., there was a telephone call from Spencer to David.

Swihart testified regarding events of March 2, 2009. On that date, Wooten was still presiding over the SAPCR involving David and Jennifer. Wooten and Spencer were communicating by text message. In the midst of their text messages, Spencer telephoned Judge Oldner's office. A transcript of the March 2, 2009 hearing before Wooten in the SAPCR case was admitted in evidence. At the hearing, Wooten stated she learned Benavides was appearing in the family law matter between David and Jennifer on Friday, February 27, 2009. Wooten stated she had spoken with Judge Oldner, the administrative judge, on February 27, 2009, about whether it was appropriate for her to hear the matter, "especially in light of [Alma] Benavides appearing on the case." Wooten indicated she had worked with Benavides through September 2008 and Benavides was her campaign treasurer. Wooten stated that "[F]or various reasons, I have to recuse myself off this case." At that hearing, David's counsel stated that David waived any conflict and asked Wooten to reconsider recusing herself from hearing the SAPCR. Wooten noted that during her election campaign, David "picked up some" of her campaign signs, but she stated she had not met him and would not know what he looked like. On March 2, 2009, Spencer and David exchanged thirty-one text messages. On March 3, 2009, there were eight text

messages between Spencer and David. On March 4, 2009, Wooten recused herself from the SAPCR involving David and Jennifer. There was one phone call between Spencer and David that day.

Swihart testified regarding Wooten's campaign expenditures and Spencer's invoices to the Wooten campaign for the period January 7, 2008 through August 29, 2008. Swihart compiled a summary of those expenses and invoices from forty-two exhibits and testimony from a previous hearing.[12] Swihart testified that pre-election expenditures on behalf of the Wooten campaign for the period January 1, 2008 through the Republican primary on March 4, 2008 totaled $81,215.26. The total amount of contributions deposited in Wooten's campaign account for that period was $12,370. Swihart testified that Spencer spent about $118,000 on Wooten's campaign, and Wooten actually paid back only about $102,000 of that amount.

Swihart testified David had a motive to bribe Wooten. Swihart explained there was a connection between the money Stacy paid to Spencer and the money Spencer spent on behalf of the Wooten campaign, and there was a connection among Stacy, David, Spencer, and Wooten. Swihart testified bribery could occur without Stacy or David ever speaking directly to Wooten about the collusive plan. Based on the evidence he reviewed, Swihart testified David used Spencer as a barrier between Wooten and himself and Stacy. Swihart gave the example of the March 7, 2008 wire transfer of $10,000 from Stacy to Spencer. On March 7, 2008, Spencer and David were in communication, followed by David and Stacy communicating with one another.

---

[12] There are discrepancies between the invoices Spencer produced in a previous hearing and the invoices he submitted to the Wooten campaign as reported by Wooten to the Ethics Commission. Wooten's campaign finance reports indicate she paid more to Spencer than was billed on the invoices produced by Spencer in the previous hearing. For example, Spencer submitted multiple invoices from Booker Industries to the Wooten campaign, but Spencer had not paid Booker Industries. Call Plus, a phone bank vendor that made telephone calls on behalf of the Wooten campaign, appears to be another vendor which had not received payment from Spencer, although Spencer invoiced the Wooten campaign for that expense. Spencer invoiced the Wooten campaign $403.15 for a purported organizational meeting with counsel and consultants, and Swihart testified that does not appear to be a legitimate charge. According to Swihart, Spencer overcharged the Wooten campaign for radio advertising when he invoiced the campaign for $17,005, but paid only $14,454.25 for that advertising.

Stacy then provided instructions to her bank to wire money to Spencer's bank account. One hour and eight minutes after the $10,000 wire transfer was posted to Spencer's account, the money was converted into a cashier's check for payment of Clements's $10,000 bonus following Wooten's victory in the Republican primary. Swihart also testified that if David was screening Stacy from contact with Wooten by utilizing Spencer as a barrier, Stacy would have been involved in the collusive enterprise.

<u>Jay Valentine</u>

Jay Valentine testified that in late 2006 or early 2007, David contacted him regarding Valentine becoming a sales vice president at TDI. In early 2007, David spoke to Valentine about being involved in a "nasty divorce" and a series of family law issues. Valentine thought that one of the people "causing [David] some trouble" was a local judge. David indicated to Valentine that he was doing some "advocacy work." Valentine began working at TDI in November 2007. In February or March of 2008, Valentine had further conversations with David about his family law matters. David had Wooten campaign signs in his office, and he told Valentine that he was working to get Wooten elected. David told Valentine there was a judge by the name of Sandoval who had made an adverse ruling against David. According to Valentine, David said Wooten was going to change "the rulings" made in David's family law matter.

David wanted to hire Spencer to work at TDI. David said several times that the reason he wanted to hire Spencer was because he was "able to fix problems." David told Valentine that he had "hired Spencer to get a candidate to run against this judge" and that Spencer was the person who had "fixed his situation with the judge, and was going to get his situation reversed." According to Valentine, David made those statements to Valentine and other employees of the TDI sales department several times. Valentine testified that Spencer also made comments to him

–44–

about Spencer's role in the judicial campaign. Spencer told Valentine that he was able to get Wooten elected and that "he owned her." According to Valentine, Spencer said two or three times that he "owned" Wooten and "used that as a reason for why he was able to get things done" and an example of "the kind of stuff I can do."

David was pushing Valentine to hire Spencer as a consultant who would facilitate meetings with executives of various corporations and help sell TDI's product. Valentine objected to hiring Spencer because he did not think it made sense for the company to hire a "lobbyist," and the only people Spencer knew were politicians. Valentine told David, "Look, if I need to bribe a judge, [Spencer's] my guy," but Spencer cannot add value with regard to sales of the company's product. Although other sales and marketing employees also opposed TDI hiring Spencer, David insisted, and Spencer was hired as a TDI consultant.

In March 2009, Valentine complained about Spencer to the TDI Board of Directors and demanded an outside investigation of Spencer by the Board based on an incident Valentine thought was a basis for TDI severing its relationship with Spencer. Valentine's complaints about Spencer related to Spencer's interaction with a female marketing director while on a business trip. In an email and memorandum setting forth his complaints about Spencer, Valentine also included information about the claims David and Spencer had made about getting Wooten elected and what Wooten was going to do in connection with David's family law matters. David came to Spencer's defense, and Valentine testified he knew his complaint about Spencer was not going to be taken seriously. TDI fired Valentine in April 2009. In June 2009, Valentine filed an employment discrimination claim against TDI. In the employment discrimination complaint, Valentine asserted that David and Spencer had told him about their role in getting Wooten elected and bragged about bribing a judge. Valentine testified that the reason he included those

claims in his employment discrimination complaint was to show David's conflict of interest with regard to Spencer. Valentine testified that his employment discrimination claim against TDI was arbitrated, resulting in an arbitration award in his favor.

<u>William Johnson</u>

William Johnson testified that he was CEO and owner of sixty-five to seventy percent of TDI. David worked at TDI, but left the company in March or April 2012. At the suggestion of David, TDI hired Spencer to resolve an issue related to TDI credit card debt, for which he was paid $5,000 by TDI. Later, David suggested to Johnson that Spencer could provide access to legislators and officials at the Texas Department of Information Resources that would facilitate marketing TDI's products to the State. Johnson and David traveled to Austin, Texas to discuss the initiative with Spencer. As a result of this initiative, Spencer was paid $80,000 by TDI for work in obtaining a rider on a State budget that would facilitate acquisition by the State of data security technology. David then proposed that TDI set up a conference with Spencer in Washington, D.C. to speak to Spencer's contacts in the federal sector.

Johnson testified that Jay Valentine was hired as the head of sales and marketing of TDI in 2007. Valentine had been well-recommended by David and two of the members of the TDI Board of Directors. In March 2009, Johnson received an email from Valentine detailing a complaint that Spencer had allegedly sexually harassed a female marketing director.[13] The email further described what Valentine believed was a conflict of interest involving David and Spencer, because TDI's hiring of Spencer could be viewed as payback for Spencer's valuable work for David personally. In a "memorandum" to TDI, Valentine said Spencer and David had

---

[13] Valentine was terminated by TDI on April 9, 2009 for "lack of performance." Valentine filed an employment discrimination complaint, asserting he was terminated by TDI for making the sexual harassment complaint. Valentine's employment discrimination complaint was arbitrated. According to Johnson, Valentine's claims were denied by the arbitrator; however, TDI was required to pay $20,000 of Valentine's attorney's fees and $10,000 for Valentine's shares of TDI stock.

been bragging about unseating a judge who had ruled against David. Johnson testified that if Spencer said he saw Wooten campaign signs in David's office, Johnson would not dispute that testimony.

*Verdict*

The jury found Stacy guilty of engaging in organized criminal activity, six counts of bribery, and money laundering. The trial court assessed punishment of ten years' confinement and a fine of $10,000 as to each count, those sentences to run concurrently. The trial court suspended imposition of the sentences, and placed Stacy on community supervision for a period of ten years. The trial court required her to serve thirty days in county jail as a condition of her community supervision. Stacy filed this appeal of those convictions.

**Bribery**

In her first issue, Stacy asserts there is insufficient evidence to support her bribery convictions. In connection with each of the six bribery counts, the jury found Stacy offered, conferred, or agreed to confer a benefit to Wooten as consideration for Wooten's filing to run for election, proceeding or continuing with a campaign for election as judge, or presiding over and issuing favorable rulings to Stacy or David in cases before her as judge.

*Standard of Review*

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667; *see also Hooper v. State*, 214 S.W.3d 9, 12 (Tex. Crim. App. 2007) (in assessing legal sufficiency of the evidence, we consider

all the evidence in the light most favorable to the verdict and determine whether, "based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt"). This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The standard is the same for both direct and circumstantial evidence cases; under this standard, circumstantial evidence is as probative as direct evidence and, alone, can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 13; *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the fact finder. *Jackson*, 443 U.S. at 318–19; *Brooks v. State*, 323 S.W.3d 893, 899–900 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury"). Evidence is not rendered insufficient simply because conflicting evidence is introduced. *Matchett v. State*, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996). "An appellate court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Ervin v. State*, 331 S.W.3d 49, 55 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). "[I]t is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances."

*Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). Any inconsistencies in the evidence are resolved in favor of the verdict. *Matson v. State*, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991).

*Analysis*

Section 36.02 of the penal code provides, in pertinent part, that a person commits bribery if:

> he intentionally or knowingly offers, confers, or agrees to confer on another . . . :
> (1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter;
> (2) any benefit as consideration for the recipient's decision, vote, recommendation, or other exercise of official discretion in a judicial or administrative proceeding. . . .

TEX. PENAL CODE ANN. § 36.02(a)(1) & (2) (West 2011).[14] It is no defense to prosecution that a person whom the actor sought to influence was not qualified to act in the desired way, whether because she had not yet assumed office, she lacked jurisdiction, or for any other reason. *Id*. § 36.02(b). The offense of bribery is complete when the offer or solicitation is made. *Martinez v. State*, 696 S.W.2d 930, 933 (Tex. App.—Austin 1985, pet. ref'd).

A person acts intentionally with respect to the nature of her conduct or to the result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West 2011). A person acts knowingly with respect to the nature of her conduct or to circumstances surrounding her conduct when she is aware of the nature of her conduct or that the circumstances exist. *Id*. § 6.03(b). A person acts knowingly with respect to a result of her conduct when she is aware that her conduct is reasonably certain to

---

[14] It is proper for an indictment to allege different methods of committing the offense in the conjunctive and for the jury to be charged in the disjunctive. *Vaughn v. State*, 634 S.W.2d 310, 312 (Tex. Crim. App. [Panel Op.] 1982). If there is sufficient evidence to prove one of the methods of committing the offense of bribery, this Court need not consider whether the evidence is also sufficient to prove the alternative theory or theories. *See Pinkerton v. State*, 660 S.W.2d 58, 62 (Tex. Crim. App. 1983).

cause the result. *Id*. "The offense of bribery focuses on the mental state of the *actor*, and is complete if a private citizen, by offering, conferring, or agreeing to confer intends an agreement." *Mustard v. State*, 711 S.W.2d 71, 75 (Tex. App.—Dallas 1986, pet. ref'd); *see also Hubbard v. State*, 668 S.W.2d 419, 420–21 (Tex. App.—Dallas 1984) (bribery focuses on the mental state of the actor, and is complete if a private citizen, by offering, conferring, or agreeing to confer, or a public servant or party official, by soliciting, accepting, or agreeing to accept, intends an agreement), *pet. granted and remanded on other grounds*, 739 S.W.2d 341 (Tex. Crim. App. 1987). Intent may be inferred from circumstantial evidence such as acts, words, and conduct of the accused. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (intent may be inferred from accused's acts, words, and conduct); *see also Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). Whether the person possessed the requisite intent to commit an offense is most often proven through the circumstantial evidence surrounding the crime. *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

In this case, the jury was charged that Stacy could be found guilty as a principal or as a party to the offenses of bribery. Under the law of parties, each party to an offense may be charged with the commission of the offense. TEX. PENAL CODE ANN. § 7.01(b) (West 2011). A person is responsible for the criminal conduct of another person if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (West 2011). When a party is not the "primary actor," the State must prove conduct constituting an offense plus an act by the defendant alone with the intent to promote or assist such conduct. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985). The jury may consider "events occurring before, during and after the

commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996). Circumstantial evidence may suffice to show the defendant is a party to the offense. *Id*.; *Miller v. State*, 83 S.W.3d 308, 313 (Tex. App.—Austin 2002, pet. ref'd). "Since an agreement between parties to act together in a common design can seldom be proved by words, the State must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or common design to commit the offense." *Miller*, 83 S.W.3d at 314. Because the charge authorized the jury to convict Stacy as a principal or a party, the verdict will be upheld if the evidence was sufficient on either of those theories. *See Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

### Allegation Bribery Statute Does Not Support Conviction

Stacy contends the bribery statute does not support a conviction for offering, conferring, or agreeing to confer a benefit to Wooten as consideration for Wooten's decision to become a judicial candidate, because a potential candidate or someone who has yet to become a candidate is not a "public servant" as referenced in the bribery statute. "Public servant" means:

> a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if he has not yet qualified for office or assumed his duties: (A) an officer, employee, or agent of government; . . . (C) an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy; . . . (E) a candidate for nomination or election to public office. . . .

TEX. PENAL CODE ANN. § 1.07(41) (West Supp. 2013). Assuming, without deciding, that Stacy could not be guilty of bribery for offering, conferring, or agreeing to confer a benefit on Wooten as consideration for Wooten's decision to become a judicial candidate, the assumption would not be dispositive with respect to the legal sufficiency of the evidence to support the bribery convictions if the jury could have found Stacy guilty of bribery for offering, conferring, or

agreeing to confer a benefit to Wooten as consideration for Wooten proceeding or continuing with a campaign for election as judge or for favorable rulings in cases involving Stacy or David. "[W]hen the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories." *See Guevara*, 152 S.W.3d at 49; *see also* TEX. ELEC. CODE ANN. § 251.001(1) (West 2010) ("candidate" means a "person who knowingly and willingly takes affirmative action for purpose of gaining nomination or election to public office or for the purpose of satisfying financial obligations incurred by the person in connection with the campaign for nomination or election").

Allegation Evidence is Insufficient to Support Conviction

Stacy argues that while she was charged under the bribery statute with offering, conferring, or agreeing to confer a benefit to Wooten in consideration for Wooten proceeding or continuing with a campaign for judge, the evidence does not support that charge because the evidence does not show Stacy had the requisite intent or that Wooten "even considered, at any time, getting out of the race after she made the decision" to become a candidate.[15]  Additionally, Stacy argues that while she was charged under the bribery statute with offering, conferring, or agreeing to confer a benefit to Wooten in consideration for Wooten's favorable rulings in cases involving Stacy or David, the evidence does not support that charge because the evidence does not show Stacy had the requisite intent or that Stacy knew that any benefit to Wooten was

---

[15] Stacy does not contend that a candidate for public office running in a party primary is not considered a public servant under the bribery statute. TEX. PENAL CODE ANN. § 1.07(41). *See Kaisner v. State,* 772 S.W.2d 528, 529 (Tex. App.—Beaumont 1989) ("As a candidate in a party primary, Robinson was clearly a public servant under the [Penal] Code. The decision to withdraw from the runoff would have been the exercise of discretion as a public servant."), *pet. ref'd*, 780 S.W.2d 226 (Tex. Crim. App. 1989) (per curiam).

supposed to constitute a bilateral agreement for favorable rulings.[16]  We are unpersuaded by these arguments.

Stacy acknowledged in her appellate briefing that there "was certainly evidence that David believed that Judge Sandoval was a bad judge and was unfairly biased against him" and there "was also evidence that [David] wanted Judge Sandoval to be defeated."  From this evidence, a rational jury could have reasonably concluded that David wanted Sandoval unseated in the March 2008 Republican primary.

The evidence showed Spencer traveled from his home near Austin, Texas to meet with David and Stacy on October 1, 2007.  Shortly after that meeting, Spencer reviewed the court file in David's divorce case and SAPCR and began contacting individuals in Collin County to find a candidate to run against Sandoval for the office of judge of the 380th Judicial District Court.  The deadline for filing as a candidate in that race was January 2, 2008.  Therefore, there was a limited amount of time to locate a candidate.  Because there was no Democrat candidate in that judicial race, the winner of the Republican primary would be the elected judge following the general election in the fall of 2008.

In his discussions with Wooten, Spencer expressed his belief that a successful campaign to unseat Sandoval would require $100,000 to $150,000, and Wooten believed that was a reasonable estimate.  The primary election was to be held only two months after Wooten declared her candidacy, and the evidence indicated it was not likely Wooten could solicit significant campaign contributions in that limited period of time, particularly since the majority of campaign contributions in judicial races are made by lawyers and lawyers are not readily

---

[16] Stacy does not contend that a sitting judge ruling on pending cases is not considered a public servant under the bribery statute.  TEX. PENAL CODE ANN. § 1.07(41).

inclined to make contributions to a candidate seeking to unseat an incumbent judge. Despite this fundraising challenge, Wooten agreed to run for election, and she appointed Spencer, who had never before managed a political campaign, to serve as her campaign manager.

In her appellate briefing, Stacy acknowledged that "the evidence shows that [Stacy] made payments to [Spencer] and that [Spencer] used a large portion of those payments to make campaign expenditures for the Wooten campaign at times when the campaign had not raised enough money to cover them."[17] For example, the day following Wooten's January 2, 2008 declaration of her candidacy, Stacy attempted to wire transfer $50,000 to Spencer. When that wire transfer was unsuccessful, Stacy wire transferred $50,000 the following day, January 4, 2008. Before that wire transfer, Spencer had $2.39 in his bank account. The evidence establishes Spencer immediately began utilizing money transferred by Stacy to pay campaign consultant Clements and other campaign expenses. Spencer testified that without the money wire transferred by Stacy, he would not have been able to pay Clements $7,500 on January 7, 2008, and $7,500 on January 8, 2008.

Sandoval's February 4, 2008 Campaign Finance Report indicated Sandoval had raised $12,575 in campaign contributions, had expended $8,997.08, and had a balance of $4,231.37 in his campaign account. The bank records for Wooten's campaign account show that on February 4, 2008, the account had a balance of $2,366, and on February 5, 2008, the account had a balance of $1,933. Despite the fact Sandoval had received significantly greater campaign contributions

---

[17] In her appellate briefing, Stacy acknowledged that the evidence shows Spencer did not immediately bill Wooten's campaign for campaign expenditures. The evidence showed Wooten's campaign was not billed for most of the campaign expenses paid by Spencer from the money transferred to him by Stacy until after the Republican primary. The jury heard testimony from Spencer that he did not want the expenditures timely shown on Wooten's campaign finance reports because those are public records and he did not want it publicly known how much money was being spent on Wooten's campaign. The jury also heard the testimony of Steusloff that a candidate must report a campaign expenditure when the amount is readily determinable, regardless of when the expense is actually billed. *See* Election Law Op. No. JWF-22 (1983) (where contract was entered into by a campaign to rent office space at a rate that exceeded $50 per month and was an expenditure under the election code upon the creation of the lessee's obligation to pay a definite amount of money, the amount of expenditure was readily determinable at the time of contracting, and election code required candidate to report on applicable sworn statement the total amount of rent payable under the contract as an expenditure as of the day of contracting).

than Wooten, Spencer told Clements he was not impressed with the amount Sandoval had raised. Spencer also communicated to Wooten and Clements that Sandoval was not "in a position to match our resources." Clements interpreted Spencer's email to mean that there were people Spencer could go to for money.

The evidence showed numerous communications between Spencer, David, and Stacy at or about the time of transfers of funds from Stacy to Spencer. For example, on January 29, 2008, the night before the second payment by Stacy to Spencer, Spencer telephoned David's cell phone. Immediately thereafter, either David or Stacy telephoned Spencer from David and Stacy's home phone. Spencer then telephoned Wooten. After the telephone call to Wooten, Spencer telephoned David and Stacy's home. Stacy made the second payment to Spencer on January 30, 2008, and Spencer deposited that payment to his account on February 1, 2008. That payment posted to Spencer's bank account on February 4, 2008. On February 5, 2008, Spencer sent an email to Wooten indicating that Sandoval "cannot match our resources," even though Wooten had raised only $3,620 for her campaign at that time. On February 14, 2008, Stacy made her third payment to Spencer. On that day, Spencer exchanged text messages by phone with David between 5:12 p.m. and 5:23 p.m. Between 5:34 p.m. and 5:46 p.m., Spencer then communicated in succession with Wooten, Clements, and David. Stacy's third payment to Spencer posted to his account on February 15, 2008. On February 26, 2008, Stacy made her fourth payment to Spencer. At 4:41 a.m. on that day, Spencer's assistant confirmed to Spencer by email that radio advertising time had been purchased for Wooten's campaign. At 5:24 a.m. and 6:59 a.m., David received text messages from Spencer. At 9:17 a.m., Stacy sent instructions to Tolleson Private Bank to wire $25,000 to Spencer. At 2:14 p.m., the wire transfer was posted to Spencer's account. Swihart testified those funds from Stacy were immediately used for

payment of Wooten campaign expenses. At 2:37 p.m. and 2:53 p.m., Spencer's wife purchased cashier's checks for payment of Wooten campaign expenses from the funds wired to Spencer's account by Stacy.

On March 4, 2008, Wooten won the Republican primary. On March 7, 2008, Stacy made the fifth payment to Spencer. Between 7:07 a.m. and 8:29 a.m. on that day, Spencer text-messaged four times with David. Clements text-messaged Spencer at 8:17 a.m. David and Stacy had three phone conversations between 8:45 a.m. and 9:10 a.m. Between 9:23 a.m. and 10:02 a.m., Spencer and David exchanged thirteen text messages. At 10:47 a.m., Stacy attempted to reach David by telephone. At 10:58 a.m., Stacy sent instructions to Tolleson Private Bank to wire $10,000 to Spencer. At 11:40 a.m., David text-messaged Spencer. At 2:51 p.m., the wire transfer of $10,000 posted to Spencer's bank account. Between 3:21 p.m. and 3:52 p.m., Spencer and David exchanged eleven text messages. At 3:59 p.m., Spencer's wife purchased a cashier's check made payable to Clements in the amount of $10,000. Between 6:24 p.m. and 6:31 p.m. on March 13, 2008, the day of the sixth payment from Stacy to Spencer, Spencer text messaged David six times. At 9:41 p.m., Stacy sent instructions by email to Tolleson Private Bank to wire Spencer $15,000. On March 14, 2008, the sixth payment from Stacy to Spencer in the amount of $15,000 was posted to Spencer's bank account.

Spencer testified he kept Stacy removed from his work on Wooten's campaign. However, evidence of the consulting agreement between Spencer and Stacy and a summary of invoices purportedly related to the agreement were introduced in evidence. The consulting agreement is dated prior to Spencer's meeting with David and Stacy where his consulting services were first purportedly discussed. The consulting agreement, dated October 1, 2007, was strikingly similar to Spencer's October 15, 2009 engagement letter with TDI. Both agreements

include an identical phrase relating solely to TDI: "[a]ny additional time spent on TDI's behalf is part and parcel to, and inclusive of this engagement." Spencer admitted when testifying at trial that when he left the October 2, 2007 meeting with David and Stacy, he did not know the name of David's employer.[18] The August 1, 2008 "summary" invoice for purported consulting services rendered by Spencer did not apply a credit for the $50,000 wire transfer from Stacy to Spencer on January 4, 2008, and the $25,000 transfer on February 26, 2008 from Stacy to Spencer did not appear as a credit on the invoice, but was handwritten on Stacy's copy of the invoice. The work product purportedly produced by Spencer pursuant to the consulting agreement was insubstantial, especially in light of the generous compensation of $25,000 for each of the four "projects" outlined in the consulting agreement. Further, the evidence indicated that Stacy purportedly paid Spencer for "projects" at times when she had not been invoiced for the work and Spencer had not provided any work product. Stacy transferred $150,000 to Spencer between January 4, 2008 and March 14, 2008, although Spencer testified he was to be paid $25,000 for each of four "projects," which would total only $100,000 under the consulting agreement.

From the evidence relating to Spencer's consulting agreement with Stacy, the jury could have reasonably inferred the agreement was a subterfuge, fabricated several years after the purported effective date to provide a false explanation for the transfers of money from Stacy to Spencer that were used to finance Wooten's campaign. On this record, including the evidence concerning the six transfers of funds from Stacy to Spencer and the communications among Spencer, David, and Stacy at or about the time of the transfers, a rational jury could have reasonably inferred that Stacy intentionally or knowingly, either as the primary actor or a party,

---

[18] Spencer later changed his testimony and indicated that David gave him a business card at the end of the October 2, 2007 meeting.

offered, conferred, or agreed to confer a benefit, as to each of her transfers of funds to Spencer, as consideration for Wooten's decision to proceed or continue with a campaign to unseat Sandoval through the Republican primary.

Although Spencer denied stating that he "owned" Wooten or that Wooten was going to "fix" David's divorce, Valentine testified Spencer said two or three times that he "owned" Wooten, and "used that as a reason for why he was able to get things done" and an example of "the kind of stuff [he could] do." Valentine testified David told him that he had "hired Spencer to get a candidate to run against this judge" and that Spencer had "fixed [David's] situation with the judge, and was going to get his situation reversed." The jury heard Johnson's testimony regarding Valentine's "memorandum" in which he said Spencer and David had been bragging about unseating a judge who had ruled against David and Valentine's email to Johnson in which he expressed his concern that TDI's hiring Spencer could be seen as a conflict of interest, that is, as payback for Spencer's role in unseating the judge presiding over David's divorce and SAPCR.

The jury also heard evidence concerning a June 2009 email exchange between Spencer and David regarding an opinion of the United States Supreme Court concerning judge recusal. *See Caperton*, 556 U.S. 868. The email included a statement from an article discussing *Caperton*, stating that "judges who receive campaign contributions large enough to create the appearance of bias should recuse themselves. . . ." In the email, Spencer stated to David that he thought David would understand why he was interested in the subject matter of that case, although Spencer denied that he and David were interested in *Caperton* because Stacy's money was used to finance Wooten's campaign.

After Wooten became the judge presiding over David's SAPCR, David's motion to modify was set to be heard by Wooten. However, shortly before the hearing on the SAPCR,

Benavides appeared in the case on behalf of Jennifer. This appearance as counsel would result in Wooten's recusal because Wooten had indicated an intent to recuse herself for a period of nine months after January 2009 from cases in which Benavides appeared. The evidence showed David contacted Spencer regarding Benavides appearing in the SAPCR, and Spencer, in turn, contacted Benavides and Basinger and told them to "get off this case," despite not being able to provide a satisfactory reason. The evidence showed numerous other contacts between Spencer and David shortly after Benavides's appearance in the SAPCR. Further, the evidence showed that shortly after Benavides appeared in the SAPCR, Spencer contacted the office of Judge Oldner, the administrative judge. On this record, including evidence of the efforts of Spencer and David to avoid Wooten's recusal in the SAPCR, the effort of Spencer to make contact with the administrative judge that had advised Wooten to recuse herself, and Stacy's six transfers of funds to Spencer and the communications among Spencer, David, and Stacy at or about the time of the transfers, a rational jury could have reasonably inferred that Stacy, intentionally or knowingly, either as the primary actor or a party, offered, conferred, or agreed to confer a benefit, as to each of her transfers of funds to Spencer, as consideration for favorable rulings by Wooten in cases in which David was a party. Further, the evidence showed that despite Benavides and Basinger appearing in the suit brought by Stacy against Jennifer and Suster that had been transferred to Wooten's court, Wooten did not voluntarily recuse herself in that lawsuit. On this record, including evidence of Wooten's failure to recuse herself from Stacy's lawsuit and Stacy's six transfers of funds to Spencer and the communications among Spencer, David, and Stacy at or about the time of the transfers, a rational jury could have reasonably inferred that Stacy, intentionally or knowingly, either as the primary actor or a party, offered, conferred, or

agreed to confer a benefit to Wooten in consideration for favorable rulings by Wooten in cases in which Stacy was a party.

Stacy argues that the evidence does not show Stacy knew that any benefit to Wooten was supposed to constitute a bilateral agreement for favorable rulings by Wooten in cases in which David and Stacy were parties. Stacy cites *McCallum v. State*, 686 S.W.2d 132 (Tex. Crim. App. 1985), for the proposition that the phrase "as consideration for," as contained in the bribery statute, "requir[es] a bilateral agreement—in effect an illegal contract to exchange a benefit as consideration for the performance of an official function." *Id.* at 136. However, *McCallum* is distinguishable from the instant case. "In *McCallum*, the indictment alleged only that the defendant conferred the benefit on the recipient. Under that indictment, proof that the defendant offered the alleged benefit was not sufficient to convict." *Martinez*, 696 S.W.2d at 932. Here, Stacy was indicted for offering, conferring, and agreeing to confer a benefit to Wooten as consideration for Wooten's running for election, proceeding or continuing with a campaign for election, and issuing favorable rulings in cases in which Stacy or David are parties. The jury was charged that they could find Stacy guilty of each count of bribery if they found she either offered, conferred, or agreed to confer a benefit to Wooten as consideration for Wooten's running for election, proceeding or continuing with a campaign for election, and issuing favorable rulings in cases in which Stacy or David are parties. *See id.* at 932–33 ("Common sense dictates that when it is alleged and proved that the defendant offered or solicited a proscribed benefit, it is not necessary to further prove that the offer or solicitation resulted in a bilateral agreement or unlawful contract with the other party."); *see also Valencia v. State*, No. 13-02-020-CR, 2004 WL 1416239, at *2 (Tex. App.—Corpus Christi June 24, 2004, pet. ref'd) (mem. op., not designated for publication).

## Political Contribution Exception

Reaching unassigned error, the dissent argues the State failed to prove the transfers from Stacy were not political contributions subject to section 36.02(d) of the penal code. Stacy did not raise as error a contention that the political contribution exception requires the reversal of her convictions. The dissent recognizes that there must be an exceptional reason for entertaining unassigned error but concludes it is appropriate in this case. We disagree that this case presents an appropriate circumstance for exercising our discretion to address, in the interest of justice, the argument made by the dissent. *See Pfeiffer v. State*, 363 S.W.3d 594, 599 (Tex. Crim. App. 2012) ("[A]ppellate courts *may* review unassigned error—a claim that was preserved in the trial court but was not raised by either party on appeal.") (emphasis added). While an appellate court may in its *discretion* address unassigned error, it is rarely required to do so, and the dissent does not argue this is a case involving fundamental unassigned error that an appellate court *must* recognize on its own. Nevertheless, because the dissent raises the unassigned error, we will address the merits of the dissent's argument.

Under section 36.02(d), "[i]t is an exception to the application of Subdivisions (1), (2), and (3) of Subsection (a) that the benefit is a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305, Government Code." TEX. PENAL CODE ANN. § 36.02(d). As the dissent acknowledges, the bribery counts specifically alleged that the benefits Stacy offered to, conferred on, or agreed to confer on Wooten were benefits "other than political contribution[s] as defined by Title 15, Election Code, or . . . expenditures[s] made and reported in accordance with Chapter 305 of the Government Code." In accordance with the bribery counts, the jury charge instructed the jury that it could find Stacy guilty of bribery only if the transfers were "other than . . . political

–61–

contribution[s] as defined by Title 15, Election Code, or . . . expenditure[s] made and reported in accordance with Chapter 305 of the Government Code." The jury charge also instructed the jury about the following definitions of "contribution," "political contribution," "campaign contribution," and "expenditure":

> "Contribution" means a direct or indirect transfer of money, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer. The term includes a loan or extension of credit, other than those expressly excluded by law, and a guarantee of a loan or extension of credit, including a loan described by law. The term does not include a loan made in the due course of business by a corporation that is legally engaged in the business of lending money and that has conducted the business continuously for more than one year before the loan is made or an expenditure required by law to be reported.

> "Political contribution" means a campaign contribution or an officeholder contribution.

> "Campaign contribution" means a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure. Whether a contribution is made before, during, or after an election does not affect its status as a campaign contribution.

> "Expenditure" means a payment, distribution, loan, advance, reimbursement, deposit, or gift of money or any thing of value and includes a contract, promise, or agreement, whether or not legally enforceable, to make an expenditure.

Each of those definitions essentially tracks the language of the applicable statute, s*ee* TEX. ELEC. CODE ANN. § 251.001, and therefore properly instructed the jury.[19] As to each of the six bribery counts, the jury found Stacy guilty as alleged in the indictment.

The evidence showed Stacy did not transfer funds directly to Wooten's campaign; Stacy's contention was that she transferred funds to Spencer to compensate him for his work under the purported consulting agreement. Steusloff testified as to what constitutes a lawful political contribution under the election code in a race for a Collin County district court bench in 2008.

---

[19] *See Morales v. State*, 357 S.W.3d 1, 5 (Tex. Crim. App. 2011); *Martinez v. State*, 924 S.W.2d 693, 699 (Tex. Crim. App. 1996) ("Following the law as it is set out by the Texas Legislature will not be deemed error on the part of a trial judge.").

According to Steusloff, a political contribution to a candidate for a Collin County bench could not exceed $2,500 for the election cycle. Each of the six transfers of funds from Stacy to Spencer that were funneled to the Wooten campaign vastly exceeded the amount of an allowable political contribution to a judicial candidate, and the transfers of funds were not reported by Wooten as political contributions under the election code on any campaign finance report or amended campaign finance report filed with the Ethics Commission or as loans under the election code on any personal financial statement filed with the Ethics Commission. *See* TEX. ELEC. CODE ANN. § 253.155(b) (West 2010).

Based on the applicable standard of review, a rational jury could have reasonably found that Stacy's payments were not political contributions as defined by the statute. Stacy does not argue otherwise on appeal.

*Conclusion*

The jury was entitled to judge the weight of the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319. Based on our review of the record and viewing the evidence in the light most favorable to the jury's findings of guilt, we conclude that as to each conviction for bribery, the evidence is sufficient to allow a rational jury to find beyond a reasonable doubt that Stacy intentionally or knowingly offered, conferred, or agreed to confer on Wooten a benefit as consideration for Wooten proceeding or continuing with a campaign for election to the 380th Judicial District Court or for favorable rulings in cases in which Stacy or David were parties. *See id.* at 318–19; *see also Hooper*, 214 S.W.3d at 13; *see also* TEX. PENAL CODE ANN. § 36.02(a)(1), (2). Further, viewing the evidence in the light most favorable to the jury's findings of guilt, we conclude the evidence is sufficient to allow a rational jury to find beyond a reasonable doubt that, as to each conviction for bribery, Stacy acted with intent to promote or

assist in the bribery, and solicited, encouraged, directed, aided, or attempted to aid Spencer or David in offering, conferring, or agreeing to confer on Wooten a benefit as consideration for Wooten proceeding or continuing with a campaign for election to the 380th Judicial District Court or for favorable rulings in cases in which Stacy or David were parties. *See* TEX. PENAL CODE ANN. § 7.02(a)(2); *see also Hooper*, 214 S.W.3d at 14, n3; *Hart*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (direct evidence of intent may be inferred from any facts which tend to prove its existence, including acts, words, and conduct of the accused, and jury may infer knowledge from such evidence) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)). We resolve Stacy's first issue against her.

## Engaging in Organized Criminal Activity and Money Laundering

In her second issue, Stacy contends the evidence is insufficient to support her conviction of engaging in organized criminal activity because there is insufficient evidence of the predicate offenses of bribery, money laundering,[20] or tampering with a government record[21] with which she was charged. In her third issue, Stacy argues that, because there was insufficient evidence of the predicate offense of bribery, there is insufficient evidence to support her conviction of money laundering.

We concluded with regard to Stacy's first issue that there was sufficient evidence to support the jury finding Stacy guilty of the offenses of bribery. Accordingly, having concluded

---

[20] Under section 34.02(a) of the penal code, a person commits the offense of money laundering if the person knowingly:

    (1) acquires or maintains an interest in, conceals, possesses, transfers, or transports the proceeds of criminal activity;
    (2) conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity;
    (3) invests, expends, or receives, or offers to invest, expend, or receive, the proceeds of criminal activity or funds that the person believes are the proceeds of criminal activity; or
    (4) finances or invests or intends to finance or invest funds that the person believes are intended to further the commission of criminal activity.

TEX. PENAL CODE ANN. § 34.02(a) (West 2011).

[21] Section 37.10(a)(5) of the penal code provides that a person commits the offense of tampering with a governmental record if he "makes, presents, or uses a governmental record with knowledge of its falsity." TEX. PENAL CODE ANN. § 37.10(a)(5) (West Supp. 2014).

there was sufficient evidence of the predicate offense of bribery, we necessarily reject Stacy's contentions that there was insufficient evidence to support her convictions for engaging in organized criminal activity and money laundering because there was insufficient evidence of the predicate offense of bribery. We resolve Stacy's second and third issues against her.

## Exclusion of Evidence

In her fourth issue, Stacy contends the trial court reversibly erred by excluding from evidence the findings of fact and conclusions of law signed by the judge hearing the SAPCR case involving David and Jennifer after Wooten recused herself. On appeal, she argues that the excluded evidence "completely vindicated David" and "undercut the charge that [David] had to bribe a judge to obtain favorable rulings." According to Stacy, Judge McCraw's findings "undo much of what Sandoval had done," and "undercut[] any alleged evidence that [David] attempted to bribe, or intended to bribe" Wooten, because the evidence shows David did not need to do so.

Before trial, the State objected to any evidence being admitted concerning rulings made by judges in the civil cases involving David, Stacy, and Jennifer, subsequent to Wooten recusing herself in the SAPCR case, as irrelevant to the allegations against Stacy that she "offered a bribe to Suzanne Wooten to encourage her to run for Judge, to continue to run for Judge once she filed to run, unseat Judge Sandoval from the bench and/or issue favorable rulings for Stacy and David." The trial court granted the State's motion in limine concerning reference to court rulings after Wooten ceased serving as the presiding judge on the cases.

Stacy filed a bill of exception containing Judge John L. McCraw, Jr.'s findings of fact and conclusions of law signed after Wooten recused herself from the SAPCR involving David and Jennifer. Stacy argued to the trial court that the findings of fact should be admitted in

evidence to show Jennifer was the "one being stubbornly litigious." The trial court ruled that the proffered evidence was not relevant.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or principles. *Lyles v. State*, 850 S.W.2d 497, 502 (Tex. Crim. App. 1993). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Martinez*, 327 S.W.3d at 736.

Stacy's argument on appeal does not comport with her argument for admission of the evidence at trial. At trial, she did not argue that the evidence should be admitted to undercut the charge that David had to bribe a judge to obtain favorable rulings, as she now argues on appeal. Instead, the argument advanced at trial for admission of the evidence was to show Jennifer was the "stubbornly litigious" individual in the SAPCR.

An appellate issue involving a proffer of evidence, in contrast to an issue involving an objection to evidence, must nevertheless satisfy the preservation-of-error requirements. *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005). To preserve an issue for appellate review, rule 33.1 of the rules of appellate procedure requires the appellant to have made "a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). Arguments on appeal must comport with the arguments made at trial and must bring to the trial court's attention the very complaint that is now made on appeal. *See Reyna*, 168 S.W.3d at 177. "[I]t is not enough to tell the judge that evidence is admissible. The

–66–

proponent, if he is the losing party on appeal, must have told the judge why the evidence was admissible." *Id.* Stacy may not, for the first time on appeal, urge error not raised at trial. The explanation given at trial for admissibility must match the one urged on appeal. *See Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002) (under rule of appellate procedure 33.1, issue is whether complaining party on appeal brought to trial court's attention the very complaint that party is making on appeal).[22]

Stacy did not articulate to the trial court her assertion that the findings of fact and conclusions of law signed after Wooten recused herself was evidence David did not attempt or intend to bribe Wooten because the evidence showed David did not need to bribe Wooten.[23] Therefore, the trial court never had the opportunity to rule upon that specific rationale for admissibility. Because Stacy did not raise in the trial court the argument she now makes on appeal, she forfeited this appellate challenge to the trial court's refusal to admit that evidence. *See id.* We resolve Stacy's fourth issue against her.

---

[22] *See also Lofton v. State*, No. 05-10-01265-CR, 2011 WL 6225415, at *2 (Tex. App.—Dallas Dec. 9, 2011, pet. ref'd) (not designated for publication) (issue is whether complaining party brought to trial court's attention the very complaint the party is now making on appeal) (citing *Martinez*, 91 S.W.3d at 335–36); *Segovia v. State*, No. 05-09-01070-CR, 2010 WL 2387511, at *3 (Tex. App.—Dallas June 16, 2010, no pet.) (not designated for publication) (trial court never had opportunity to rule upon specific rationale for admissibility; because appellant did not raise in trial court argument in support of admissibility he made on appeal, he forfeited his appellate challenge).

[23] Even if this argument had been made before the trial court, it is unpersuasive. The evidence Stacy would like to have in the record shows, according to Stacy, that when a judge other than Sandoval was presiding over David's SAPCR, rulings were more favorable to David. This evidence does not advance Stacy's cause.

## Conclusion

Having resolved Stacy's four issues against her, we affirm the trial court's judgments.


/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

FitzGerald, J., dissenting

Do Not Publish
TEX. R. APP. P. 4

121421F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

STACY STINE CARY, Appellant

No. 05-12-01421-CR V.

THE STATE OF TEXAS, Appellee

On Appeal from the 366th Judicial District Court, Collin County, Texas,
Trial Court Cause No. 366-81637-2011.
Opinion delivered by Justice Fillmore,
Justices FitzGerald and Lang participating.

Based on the Court's opinion of this date, the judgments of the trial court are **AFFIRMED**.

Judgment entered this 28th day of August, 2014.